Michael Allen **SCHMITT**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 25882.

United States Court of Appeals
Fifth Circuit.

June 11, 1969.

Rehearing Denied July 14, 1969.

George T. Kelly, III, Cocoa Beach, Fla., for appellant.

Thomas G. Wilson, Asst. U. S. Atty., Tampa, Fla., Edward F. Boardman, U. S. Atty., Middle District of Florida, for appellee.

Before WISDOM, THORNBERRY and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This is another selective service case. Michael Allen Schmitt seeks deliverance from his conviction for willfull failure to submit to induction into the Armed Forces of the United States. 50 U.S. C.A. App. § 462.

On October 23, 1963, appellant Schmitt enlisted in the Army National Guard Unit at Cocoa, Florida. He served six months of active duty, attended summer camp for two years, and attended drills for a period of approximately three and one-half years.

During May of 1965, Schmitt acquired four unexcused absences from meetings of the National Guard. The absences were all attributable to Schmitt's failure to attend one weekend drill which consisted of four separate drill sessions. Schmitt was recommended for a court martial, but after further inquiry the charges were dropped and the absences forgiven in the hope that Schmitt would reform and continue his soldiering in a more assiduous manner.

In February of 1966 Schmitt missed a weekend trip to Camp Blanding, Florida, and was again carried on the Guard's rolls as having missed four drills. As a result Schmitt was once again recommended for a court martial. Since both the February absence and the May absence of the previous year were, allegedly, the result of a conflict between weekend drills and defendant's job delivering newspapers, Schmitt now bestirred himself and on March 4, 1966 requested a discharge or transfer due to an incompatible occupation. 32 U.S.C.A. App. § 1101.18. This application was denied by the National Guard after consideration at various levels.

Schmitt then acquired unexcused absences on April 2 and 3, 1966, and on May 14 and 15, 1966. He apparently had permission to make up these absences, but neglected to do so within the required thirty days. There is some uncertainty in the record on this point as defendant claims he was sometimes not credited with make-up work properly performed within the required period.

Following these absences Schmitt was certified by the National Guard as having performed unsatisfactorily. This certification was sent to Schmitt's local draft board on DD Form 44 and the board thereafter ordered him to report for priority induction pursuant to 32 C.F.R. § 1631.8. This regulation, authorized by 50 U.S.C.A. App. § 456(c) (2) (D), instructs local draft boards that members of a reserve unit whose performance has been certified as unsatisfactory "shall be ordered to report for induction by the local board regardless of the class in which he is classified and without changing his classification." Acting in accordance with this directive, Local Board 35 ordered Schmitt to report for priority induction on June 13, 1966.

Schmitt states that the certification of unsatisfactory performance which generated his induction order was caused by the fact that he stood up for his rights in the preliminary stages of court martial proceedings then pending against him. He had at the time retained a lawyer to defend him in those proceedings. He alleges that shortly after his lawyer obtained affidavits from two of his superiors at the newspaper substantiating his claim of a conflict between his job and the National Guard meetings, the certification of unsatisfactory performance was mailed to his draft board. Schmitt thereby implies some kind of ulterior motive on the part of the National Guard in certifying his performance as unsatisfactory.

On June 13, 1966, Schmitt reported to the induction station as ordered and proceeded through the normal procedures, passing all tests. In the ceremony room, however, he refused to take the step forward which symbolized entrance into the Armed Services. He based his refusal

on the grounds that his induction was improper and that he was awaiting word from his attorney who was seeking a writ of habeas corpus. The officer in charge of the swearing in advised Schmitt of the consequences of his refusal and again asked him if he would submit to induction. He refused.

At this point, Schmitt was turned over to the Commanding Officer of the induction station. The Officer read Schmitt the regulations which explained the consequences of his refusal to submit to induction, and offered him another opportunity to accept. Schmitt again refused, explaining to the Officer that his attorney in Jacksonville was attempting to procure a writ of habeas corpus. The Commanding Officer, after consultation with his superiors, then gave Schmitt approximately two hours in which to contact his attorney. When no developments occurred during that time, Schmitt was given yet one more opportunity to submit to induction, and after his refusal, he was sent home.

On this appeal Schmitt argues that even if his conduct as a guardsman was militarily lackadaisical, he was still a member of the Armed Forces on his induction date and therefore not assimilable through the Selective Service System. He tries to propound this riddle: how can one who is already in the Armed Forces be subject to the draft and be tried for refusal of induction? Schmitt suggests that the only proper way to induct a recalcitrant guardsman is first to discharge him from the National Guard and then to induct him from his civilian status.

Schmitt misconceives the status and obligations of a guardsman under the Universal Military Training and Service Act.[1] The Act stipulates in part that "Except as otherwise provided in this title * * * every male citizen of the United States * * * who is between the ages of 18 years and 6 months and 26 years * * * shall be liable for training and service in the *Armed Forces* of the United States." [Emphasis added.] 50 U.S.C.A. App. § 454. The term "Armed Forces" is defined in 50 U.S.C.A. App. § 466(c) of the Act to include "the Army, the Navy, the Marine Corps, the Air Force, and the Coast Guard." The Army National Guard is not included in the term "Armed Forces" as used in the Act;[2] consequently up until 1963 persons who enlisted in the National Guard between the ages of 18½ and 26 were not immune from induction under the Universal Military Training and Service Act. See 1963 U.S.Code Cong. and Adm.News, p. 845. In 1963, however, Congress enacted Public Law 88–110, 77 Stat. 134,[3] which amended 50 U.S.C.A. App. § 456(c) (2) to permit the deferment[4] of a member of the National Guard "so long as he performs satisfactorily. * * *" 50 U.S.C.A. App. § 456(c) (2) (A) (iii). In order to emphasize that the deferment remained in force only so long as the guardsman conscientiously fulfilled his obligations, Congress enacted a penalty provision which provided for the priority induction of any guardsman whose performance was certified by the National Guard as unsatisfactory. 50 U.S.C.A.

1. In 1967, Congress amended the Universal Military Training and Service Act. The Act is now known as the "Military Selective Service Act of 1967." 50 U.S.C.A. App. § 451(a). Schmitt, however, refused induction prior to the 1967 amendment and was therefore tried and convicted under the old Universal Military Training and Service Act.

2. The "National Guard" as used in the Act is included within the larger definitional category "reserve components of the armed forces" defined in 50 U.S.C.A. App.

§ 466(i). The meaning of the term "National Guard" is more extensively defined at 10 U.S.C.A. § 101(9) and § 101(10) and is also distinguished there from the definition of the term "Armed Forces." 50 U.S.C.A. App. § 101(4).

3. See 1966 U.S.Code Cong. and Adm.News, pp. 147–149.

4. A member of the National Guard receives a 1–D deferment "so long as he continues to serve satisfactorily as such member. * * *". 32 C.F.R. § 1622.13.

App. § 456(c) (2) (D) [5] and 32 C.F.R. § 1631.8.[6] Neither the penalty provision itself, nor its legislative history indicates that a guardsman must be discharged before priority induction may be invoked. See 1966, U.S.Cong. and Adm.News, pp. 147–148 and 844–850. In fact, a regulation of the National Guard clearly dictates to the contrary. The regulation provides that a delinquent guardsman may *not* be discharged pending certification to his local draft board:

"(1) Individuals in the Army National Guard with a remaining service obligation under the Universal Military Training and Service Act, as amended, who cannot participate with the unit for the reasons shown below will

5. 50 U.S.C.A. App. § 456(c) (2) (D) (1968) :

Notwithstanding any other provision of this Act, the President, under such rules and regulations as he may prescribe, may provide that any person enlisted or appointed after October 4, 1961, in the Ready Reserve of any reserve component of the Armed Forces (other than under section 511(b) of Title 10), the Army National Guard, or the Air National Guard, prior to attaining age of twenty-six years, or any person enlisted or appointed in the Army National Guard or the Air National Guard or enlisted in the Ready Reserve of any reserve component prior to attaining the age of eighteen years and six months and deferred under the prior provisions of this paragraph as amended by the Act of October 4, 1961, Public Law 87–378 (75 Stat. 807), or under section 262 of the Armed Forces Reserve Act of 1952, as amended [former section 1013 of Title 50], who fails to serve satisfactorily during his obligated period of service as a member of such Ready Reserve or National Guard or the Ready Reserve of another reserve component or the National Guard of which he becomes a member, may be selected for training and service and inducted into the armed force of which such reserve component is a part, prior to the selection and induction of other persons liable therefor.

6. 32 C.F.R. § 1631.8 (1969) :

Registrants who shall be inducted without calls.

(a) Notwithstanding any other provision of the regulations in this chapter, any registrant enlisted or appointed after October 4, 1961, in the Ready Reserve of any reserve component of the Armed Forces (other than under section 511(b) of title 10, United States Code), the Army National Guard, or the Air National Guard, prior to attaining the age of 26 years, or any registrant enlisted or appointed in the Army National Guard or the Air National Guard prior to attaining the age of 18 years

and 6 months and prior to September 3, 1963, and deferred under the provisions of section 6(c)(2)(A) of the Univeral Military Training and Service Act, as amended, which were in effect prior to September 3, 1963, or any registrant enlisted in the Ready Reserve of any reserve component of the Armed Forces prior to attaining the age of 18 years and 6 months and prior to August 1, 1963, and deferred under section 262 of the Armed Forces Reserve Act of 1952, as amended, who fails to serve satisfactorily during his obligated period of service as a member of such Ready Reserve or National Guard or the Ready Reserve of another reserve component or the National Guard of which he becomes a member as certified by the respective armed force, shall be ordered to report for induction by the local board regardless of the class in which he is classified and without changing his classification. Any registrant who is ordered to report for induction under this paragraph shall be forwarded for induction at the next time the local board is forwarding other registrants for induction or at any prior time when special arrangements have been made with the induction station, without any calls being made for the delivery of such registrants. Whenever the local board desires to deliver such a registrant specially, it shall request the State Director of Selective Service to make the special arrangements for the time and place at which the registrant may be delivered for induction.

(b) At the induction station, each registrant who is forwarded for induction under paragraph (a) of this section shall be inducted into the armed force of which the reserve component in which the registrant is a member is a part.

(c) Notwithstanding any other provision of law, any registrant who has failed or refused to report for induction shall continue to remain liable for induction and when available shall be immediately inducted.

not be discharged from the Army National Guard but will be transferred to the Inactive National Guard for the remainder of their enlistment.

(i) Continuous and wilful absence from military duty.

\* \* \* \* \* \*

"(2) The removal of the above individuals from an active Army National Guard status will be reported to the local board on DD Form 44 (Military Status of Individual)." [7]

In addition to this regulation, a number of cases have indicated on their facts that a formal discharge from a reserve component is not a precondition to priority induction. *Cf.* In re McBee, S.D. Calif.1968, 287 F.Supp. 926, 927; Mader v. Clifford, No. 48,612 (N.D.Calif. July 26, 1968), 1 SSLR 3185. Other cases in this same area indicate by their silence on the discharge issue that formal severance from a reserve component is not a prerequisite to the priority induction procedure. *Cf.* United States v. Lonstein, 2 Cir. 1966, 370 F.2d 318, 319; United States v. Smith, D.Mont.1967; 266 F.Supp. 309, 309–310. In fact, discharge could accomplish no useful purpose not also achieved by certification.

The certification procedure advises the local board that the guardsman's services are no longer desired and no longer satisfactory. This procedure proclaims that he has breached the conditions of his deferment and is once more at the disposal of the Selective Service System. Such a procedure does not depend in any way upon an express discharge from a reserve component. A guardsman or reservist is not a player of now you are in and now you are out, nor do the relevant statutes prescribe a game of occupational shuttlecock with military life at one terminus and civilian life at the other. All that Congress intended by 50 U.S.C.A. App. § 456(c) (2)

(D) was to foreclose the use of the National Guard and other reserve programs as escapist havens for ex parte soldiering. This Congressional purpose was accomplished by the simple expedient of granting conditional deferments to those in reserve components. Once such a deferment is lost, the guardsman or reservist in question, with or without a discharge, is once more a part of the Selective Service manpower pool. From that moment until the expiration of his statutory obligation under the Act, he is once more vulnerable to induction.

▮▮ Schmitt presents no argument to suggest that this analysis is in error. He merely contends that the National Guard should have discharged him contrary to its own regulations because he is already in the Armed Forces and therefore not liable for induction. This argument has already been demonstrated to be untenable. A guardsman enjoys no immunity under the Universal Military Training and Service Act apart from his deferment. Violation of the condition of his deferment places him in no better position than his civilian contemporaries.[8]

▮ Schmitt also contends that his case presents a jurisdictional conflict between military and civilian authorities. He argues that because a court martial proceeding is still pending against him, the district court had no jurisdiction under 50 U.S.C.A. App. § 462 and 18 U.S.C.A. § 3231 to try him for refusing induction.

The government responds to this argument by pointing out that refusal of induction is a civilian crime, and that offenses against laws of the United States are triable in United States District Courts even when they involve military personnel. Peek v. United States, 9 Cir. 1963, 321 F.2d 934, 5 A.L.R.3d 802, cert. denied, 376 U.S. 954, 84 S.Ct. 973, 11 L.Ed.2d 973; United States v. Ca-

---

7. This regulation may be found at 32 U.S.C.A. App. § 1101.18(d) (3).

8. In fact, violation of the conditions of his deferment places the delinquent guardsman in a worse position than his civilian contemporaries because of his liability to placement in a priority induction group. 32 C.F.R. § 1631.8.

nella, S.D.Cal.1945, 63 F.Supp. 377, aff'd, Canella v. United States, 9 Cir. 1946, 157 F.2d 470. The fact that an offender may be answerable to a court martial for his civilian offenses does not absolve him before civilian courts. Kennedy v. Sanford, 5 Cir. 1948, 166 F.2d 568. Schmitt cannot therefore prevail even if he has his argument both ways. If he is still subject to military justice, he is nonetheless responsible for non-military crimes before civilian courts. If, on the other hand, he is not subject to military justice, then he can find no refuge in any claim to the exclusivity of military law.

There is furthermore no chance that Schmitt will be tried twice for the same offense. The National Guard has no authority to try him for refusal of induction. See 50 U.S.C.A. App. § 462;[9] Billings v. Truesdell, 1944, 321 U.S. 542, 64 S.Ct. 737, 87 L.Ed. 917. The court martial pending against Schmitt is not for refusal of induction, but for unexcused absences from required military drills. There is consequently no direct conflict of jurisdiction between the military and civilian authorities with respect to the offense here under review.

Schmitt also contends that the district court committed reversible error in finding a basis in fact for the National Guard's certification of his unsatisfactory performance. He claims that the only basis for the certification was the personnel pique of his superior officers. They were angered, he contends, by his submission of affidavits that were filed with the National Guard in anticipation of his pending court martial. The affidavits allegedly angered Schmitt's superiors because they contradicted the testimony of a fellow officer.

The government argues that this court may not consider the possibility of personal bias or whimsy by the National Guard in our review of the lawfulness of Schmitt's induction order, though it is conceded that the induction order is based almost entirely upon the certification. 32 C.F.R. § 1631.8. The government relies upon United States v. Lonstein, *supra,* 370 F.2d at 320, for the proposition that certification is within the exclusive province of the National Guard and therefore not reviewable by the courts. We must disagree.

The precise reasoning of *Lonstein* on the certification issue is not entirely clear, but it appears to be based largely upon the view that the role of draft boards in certification cases is purely "ministerial." Since reclassification of a guardsman is not required where his performance has been certified as unsatisfactory, 32 C.F.R. § 1631.8, whether or not there is any basis in fact for the certification is said to be a matter "for the Army," and not for the draft board. United States v. Lonstein, *supra.*

One difficulty with the *Lonstein* approach is its characterization of the role of draft boards in certification cases as purely "ministerial." Several recent cases have pointed out a conflict between 32 C.F.R. § 1631.8 ("shall be ordered to report for induction") and 50 U.S.C.A. App. § 456(c) (2) (D) ("may be * * inducted") which indicates that draft boards do possess discretion when considering certification cases. See Quaid v. United States, 10 Cir. 1967, 386 F.2d 25; Lurie v. United States, 5 Cir. 1968, 402 F.2d 297. Still other cases indicate that where this discretion is invoked, and the registrant is reclassified, he becomes entitled by right to an appeal of his new classification. United States v. Bricker, No. 41,239 (N.D.Cal.1967); Mader v. Clifford, No. 48,612 (N.D.Cal. 1968), 1 SSLR 3185.

Another difficulty with *Lonstein* is suggested by Estep v. United States,

---

9. " * * * No person shall be tried by court martial in any case arising under this title [said sections] unless such person has been actually inducted for the training and service prescribed under this title [said sections] or unless he is subject to trial by court martial under laws in force prior to the enactment of this title [June 24, 1948]. * * * " 50 U.S.C.A. App. § 462.

1946, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567. The Court there expressed concern with induction orders that might be based on bias or discrimination, or might otherwise be contrary to law.[10] It would seem that a certification order based upon the same unlawful considerations would also taint the induction order and that courts should not be foreclosed from exploring such allegations.

"If a local board ordered a member of Congress to report for induction, or if it classified a registrant as available for military service, because he was a Jew, or a German, or a Negro, it would act in defiance of the law. If a local board refused to reopen on the written request of the State Director a registrant's classification and refused to cancel its order to report for induction, it would be acting in the teeth of the regulations. In all such cases its action would be lawless and beyond its jurisdiction.

"We cannot read § 11 as requiring the courts to inflict punishment on registrants for violating whatever orders the local boards might issue. We cannot believe that Congress intended that criminal sanctions were to be applied to orders issued by local boards no matter how flagrantly they violated the rules and regulations which define their jurisdiction. We are dealing here with a question of personal liberty. A registrant who violates the Act commits a felony. A felon customarily suffers the loss of substantial rights. Section 11, being silent on the matter, leaves the question of available defenses in doubt. But we are loathe to resolve those doubts against the accused. We cannot readily infer that

Congress departed so far from the traditional concepts of a fair trial when it made the actions of the local boards 'final' as to provide that a citizen of this country should go to jail for not obeying an unlawful order of an administrative agency. We are loathe to believe that Congress reduced criminal trials under the Act to proceedings so barren of the customary safeguards which the law has designed for the protection of the accused." 327 U.S. at 121–122, 66 S.Ct. at 427.

■ The trial judge in the case at bar, perhaps also "loathe to dispense with the customary safeguards which the law has designed for the protection of the accused," heard testimony on the certification issue in chambers, out of the presence of the jury. In adopting such a procedure, he appears to have followed the practice established in Cox v. United States, 1947, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59, for the determination of the lawfulness of a registrant's classification, and also adopted in United States ex rel. Goldstein v. McNamara, E.D.Pa.1967, 270 F.Supp. 892, for the determination of the lawfulness of a reservist's certification. We commend the trial judge's adoption of such a procedure. It enabled him to make an informed judgment concerning the lawfulness of Schmitt's induction and gave substance to his conclusion that there was a basis in fact for the National Guard's certification. Considering that appellant had incurred at least eight unexcused absences from required drills, we certainly cannot say that the court was in error. In fact, by disabusing the spectre of capriciousness or arbitrariness which appellant had declared to be the basis of

---

**10.** Since *Estep*, Congress has provided for judicial review of "the classification or processing of any registrant * * * only when there is no basis in fact for the classification assigned to such registrant * * *" 50 U.S.C.A. App. § 460 (b)(3). While a delinquent guardsman need not be formally reclassified prior to induction, 32 C.F.R. 1631.8, it has been held that he "has the same rights in court as he would have if he had been reclas-

sified by the selective service system." United States ex rel. Goldstein v. McNamara, E.D.Pa.1967, 270 F.Supp. 892, 893. A guardsman would not enjoy the same rights as those reclassified if the lawfulness of his induction was not open to review, or if a wholly arbitrary certification order was an adequate "basis in fact" for an order of induction. *Cf.* United States ex rel. Goldstein v. McNamara, *supra*, at 895.

the Guard's certification, the court placed the certification and the subsequent induction order upon even firmer ground. Thus buttressed, the certification became an unconditional fiat not subject to jury impeachment.

Schmitt next contends that he was never given the opportunity to accept induction into the Armed Forces in accordance with the procedures described in Special Regulation 615–180–1.[11] He interprets Chernekoff v. United States, 9 Cir. 1955, 219 F.2d 721 as requiring that the prospective inductee be given two chances to take the symbolic step forward described in the regulation, and two warnings of the consequences of a failure to do so. He concedes that he was given one opportunity to step forward in the precise words of the regulation and he concedes that he was given numerous opportunities to submit to induction thereafter. But he contends that the latter opportunities were not couched in the exact terms of the regulation set forth in *Chernekoff*.

Appellant misreads the *Chernekoff* case. While it is true that *Chernekoff* required strict compliance with the precise language of the regulation, it merely required that the step forward language and the penalties for failure to submit to induction be read once. In *Chernekoff* the inductee was never given the prescribed opportunity to step forward. In the instant case Schmitt was given the precise step forward opportunity the first time around, and having refused the opportunity once, was thereafter warned of the penalties of refusal and asked in general language whether he would submit to induction. These latter general offers carried the clear implication that if he agreed to submit to induction, then he would be given a second chance to take the symbolic step forward. Meaningless repetition of the ceremonial language was not required. See Bradley v. United States, 9 Cir. 1954, 218 F.2d 657, 660–661, rev'd on other grounds, 348 U.S. 967, 75 S.Ct. 532, 99 L.Ed. 754. However, assuming *arguendo*

11. See Chernekoff v. United States, 9 Cir. 1955, 219 F.2d 721, 724, n. 12:

"23. Induction.—The following procedure will be followed in the induction of all registrants into the Armed Forces:

"a. Registrants who have been determined to be fully qualified for induction in all respects will be assembled. The inducting officer will inform them of the imminence of induction, quoting the following:

"You are about to be inducted into the Armed Services of the United States, in the Army, the Navy, or the Air Force, as indicated by the service announced following your name when called. You will take one step forward as your name and service are called and such step will constitute your induction into the Armed Service indicated.

"b. A commissioned officer or warrant officer then will call the roll and the foregoing procedure will be carried out. * * * "

\* \* \* \* \*

"27. Processing registrants in special categories.

\* \* \* \* \*

"b. Registrants who refuse to submit to induction.—Any registrant removed from the group as prescribed in paragraph 23, and who persists in his refusal to submit to induction, will be informed that such refusal constitutes a felony under the provision of the Selective Service Regulations. He will be informed further that conviction of such an offense under civil proceedings will subject him to be punished by imprisonment for not more than 5 years, or a fine of not more than $10,000, or both. He will then be informed again of the imminence of induction using the language specified in paragraph 23a, and his name and service again will be called. If he steps forward at this time, he will be informed that he is a member of the armed service concerned, using the language specified in paragraph 23b. If, however, he persists in refusing to be inducted, the following action will be taken:

"(1) The registrant will be requested, but not required, to make a signed statement, dated, in his own handwriting, as follows: 'I refuse to be inducted into the Armed Services of the United States.' Such statement should be witnessed by at least two witnesses who shall affix their signatures to the statement. Registrants who refuse induction will not be furnished any means of transportation."

that there was a slight departure from the strict letter of the regulation, clearly appellant was not prejudiced thereby. Edwards v. United States, 9 Cir. 1968, 395 F.2d 453, 457, cert. denied, 393 U.S. 845, 89 S.Ct. 128, 21 L.Ed.2d 115. Minor departures from the ordinary induction procedure are no defense. Edwards v. United States, *supra*.

In this connection we note that the abracadabra of the step forward is not a meaningless ritual if confined to its intended function, and if not allowed to become an end in itself. Its legitimate purpose is to insure that the prospective inductee knows the effect, pains and penalties of refusing induction, and it has also "for its object the separation with certainty of those who would not be inducted from those who would." Bradley v. United States, *supra*, 218 F.2d at 661. If, therefore, the facts clearly show that the inductee at the time or times of stepping forward is sensitive to all that the ritual would impress upon him, and that he still refuses induction, then it becomes a mere pantomime without meaning, to insist that the ritual be repeated again and again. The regulations do not compose a ballet. After the first warning and refusal, it is incredible to believe that additional ceremonial offers would be anything but exercises in futility.

■ Appellant also entreats reversal because of allegedly prejudicial remarks in the prosecuting attorney's closing argument to the jury. However, appellant's counsel lodged no objection to this closing argument at trial, remaining instead supinely silent during its presentation. Under such circumstances the teachings of United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 239, 60 S.Ct. 811, 851, 84 L.Ed. 1129, 1176, become pertinent. "* * * counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." This rule remains as a sentinel in our appellate process. In keeping, however, with the reiterated wisdom that courts "may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings," United States v. Socony-Vacuum Oil Co., 310 U.S. at 239, 60 S.Ct. at 851, we have carefully read the prosecutor's closing remarks to the jury and find them non-prejudicial.

■ Some of the prosecutor's remarks to which appellant objects were made in reasonable refutation of subjects first introduced by appellant's own closing argument. Others, such as the prosecutor's statements of personal belief in appellant's guilt, while improper, are prejudicial only if the jury is led to believe "that there is other evidence, unknown or unavailable to the jury, upon which the belief in the guilt of the accused is based." Devine v. United States, 10 Cir. 1968, 403 F.2d 93, 96; McMillian v. United States, 5 Cir. 1966, 363 F.2d 165, 169; Gradsky v. United States, 5 Cir. 1967, 373 F.2d 706, 710. We find no such reasonable possibility here. Even applying the most generous application of the salutary plain error rule, F.R.Crim. P. 52(b), the prosecutor's arguments still do not rise to that degree of flagrancy required to animate a reversal. Samuels v. United States, 5 Cir. 1968, 398 F.2d 964.

■ Schmitt's final objection is to the sufficiency of the evidence to support a conviction. He argues that he failed to sign certain induction papers and he claims that he never went to the ceremony room where he was charged with refusing induction. However, Schmitt's testimony on both the induction ritual and the paper processing was contradicted by government witnesses. The truth of his assertions was consequently for the jury to believe or disbelieve. "It is not for us to weigh the evidence or to determine the credibility of witnesses." Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704. In criminal cases "The verdict of

a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Id.* The jury was within its rightful province in choosing to disbelieve Schmitt's denials. The remaining testimony by government witnesses was sufficient for a jury to find appellant guilty—and it did.

The conviction below is affirmed.

Affirmed.