**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Paul L. WAYMAN, Paul Howard Noe alias H. P. Knowles, Robert L. Hutcheson, and Victor M. Moore, Jr., Defendants-Appellants.**

**No. 73–3664.**

United States Court of Appeals,
Fifth Circuit.

April 3, 1975.

Theodore S. Worozbyt, Atlanta, Ga. (Court appointed), for Moore.

Austin T. Smith, Los Angeles, Cal., for Hutcheson.

Hugh M. Dorsey, III, Atlanta, Ga. (Court appointed), for Noe.

John W. Stokes, U. S. Atty., William P. Gaffney, Anthony M. Arnold, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before GODBOLD and MORGAN, Circuit Judges, and BOOTLE, District Judge.

BOOTLE, District Judge:

On a fifty-three count indictment, alleging violations of 18 U.S.C. § 371 (conspiracy to violate federal law), § 1341 (mail fraud), § 1343 (fraud by wire), and § 2314 (fraudulent inducement of interstate travel), the jury returned verdicts of guilty on various counts against appellants, Paul L. Wayman, Paul Howard Noe, Robert L. Hutcheson, and Victor M. Moore, Jr.; two other persons were found guilty and filed notices of appeal but have not prosecuted their appeals. Appellants raise various issues, but we have determined that no reversible error was committed. We affirm.

## I. FACTS

The record in this seven-week trial is voluminous, and it is neither necessary nor desirable to recount all of the facts of the fraudulent scheme as it was perpetrated upon each of the twenty-one victims. Instead, we give the following scenario (drawn from the government's brief) as typical of the procedure which was repeated with each victim, with slight variations from time to time.

Allied Mortgage Consultants, Inc. [Allied Mortgage] advertised through the *Wall Street Journal* that it had $200,-000,000 available for loan commitments to borrowers. The victim, a developer or builder seeking a commitment for permanent financing in order to secure construction financing, encouraged by the advertisement, contacts Allied Mortgage and is asked to forward a complete loan package on his proposed project.

The victim then receives a letter from Allied Mortgage advising that the loan committee has expressed favorable interest and that commitment intent was being made, subject to final approval of evaluation and credit. The letter also states that to complete the package for final committee action, the results of site inspection and evaluation recommendations would have to be prepared and sub-

mitted to the loan committee by Allied Mortgage's independently contracted evaluator. The victim is also informed in this letter of the cost of the evaluation inspection.

The victim then forwards his cashier's check to Allied Mortgage to cover the inspection and evaluation fee. The inspection is made by an allegedly independent evaluator, in most instances an individual employed by Allied Mortgage for this purpose. No project was ever turned down by the evaluator or Allied Mortgage.

The victim then receives a letter from Allied Mortgage, advising of the committee's approval and allowing the victim approximately fifteen days to conclude formal application and place one percent of the desired loan amount in escrow prior to the commitment offer. The victim is asked to travel to the Atlanta office of Allied Mortgage with a certified or cashier's check for one (to three) percent of the loan amount in order to meet with Allied Mortgage personnel, negotiate an escrow agreement, and deliver the check to the escrow agent.

The "independent" escrow agent then advises the victim by mail that he has a firm loan commitment and that the agent will furnish a certified copy for an additional one to three percent of the loan amount. The victim is finally allowed a limited amount of time to obtain the actual commitment from the escrow agent by furnishing payment of the final fee of three to four percent of the loan amount. At this point, or at whatever point negotiations between Allied Mortgage and the victim are broken off, the "independent" escrow agent disburses to Allied Mortgage the funds held in escrow, allegedly pursuant to the escrow agreement.[1]

With this understanding of the scheme, we proceed to a discussion of the issues raised by appellants.

## II. ALLEGED JUROR BIAS

Subsequent to trial, appellant Noe moved for a new trial on the ground that he had been deprived of his constitutional right to a fair and impartial jury panel, due to the presence of Dennis Lee Cash as a juror. In support of his allegation of bias, Noe submitted the affidavit of Walter Foster, president of a company which (according to the affidavit) "indirectly controlled" Cash's employer. Noe had transacted business with Foster, and as a result Foster's company had suffered a substantial monetary loss. No other factual allegations were made to support the argument of bias. When the court asked on voir dire whether any of the jurors had had any business or social dealings with any of the defendants, Cash remained silent.

■■ There are several problems with Noe's argument. There is nothing to indicate that juror Cash ever recognized Noe during the trial; Noe concedes that he never recognized Cash but that someone else pointed out to him Cash's identity. The business transaction took place four years before the trial. The affidavit shows that Foster was biased against Noe, but the quantum leap from Foster's bias to the conclusion that Cash must also have been biased is a jump we are not prepared to make.[2] We note that Noe did not file an application for the court to question jurors and thereby determine whether Cash knew Noe or was in any degree biased; instead Noe chose to rely upon Foster's conclusions as contained in his affidavit.[3]

---

1. This type of scheme apparently is not without parallel. A similar operation was involved in United States v. Moore, 505 F.2d 620 (5th Cir. 1974).

2. At most, Foster's affidavit simply states his conclusion that at the time of the business incident four years back, Cash "demonstrated . . . an accordance with [Foster's] con-

demnation and attribution of blame and guilt" to Noe.

3. At oral argument in this court, counsel for Noe requested that we order an evidentiary hearing on the question of the juror's alleged bias. We sit to review alleged errors on the part of the trial court, and we decline the request.

■ In any trial there is the presumption that the jury is impartial and unbiased; it is incumbent upon the defendant to prove otherwise. Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); United States v. Robbins, 500 F.2d 650 (5th Cir. 1974). This court stated in United States v. Cashio, 420 F.2d 1132 (5th Cir. 1970) that prejudice will not be presumed but that the defendant has the burden of proving prejudice by a preponderance of credible evidence. This burden must be sustained " 'not as a matter of speculation but as a demonstrable reality.' " Beck v. Washington, *supra.* Noe has fallen far short of rebutting the presumption of impartiality. The district court did not err in denying the motion for a new trial based upon the allegation of juror bias.

Appellant Hutcheson also cites as error the alleged bias of juror Cash as to appellant Noe. For the reasons already given, *inter alia,* his argument is not persuasive.

### III. DENIAL OF MOTIONS FOR SEVERANCE, MISTRIAL, AND DISMISSAL

Appellants Wayman, Noe, Moore, and Hutcheson contend that the trial court erred in denying their various motions after the witness J. Wayne Schilling testified that he had had dealings with Wayman and a company called Franchise Funding International but that he had never had any contact with Allied Mortgage.[4] Defendant Shaffer's attorney moved for a severance on the ground that the nature of the case (fifty-three counts, sixteen named defendants) was too complicated to allow a fair trial. Defendants Fitzpatrick and Donahue joined in this motion and added that, in the alternative, the motion be for a mistrial. Defendant Smith joined in the motion and added the additional ground of mutually harmful defense tactics by different defendants. Appellant Hutcheson moved for a dismissal on the ground that the indictment improperly joined a number of conspiracies in one count charging a single conspiracy. Defendants Fitzpatrick and Donahue amended their motion to include this general ground. Appellant Noe adopted all these motions. The trial court denied all these motions.

■ Under Rule 8, Federal Rules of Criminal Procedure, defendants may be joined in the indictment and at trial if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Once the requirements of Rule 8 have been satisfied, it is then within the sound discretion of the trial court whether the defendants will be tried separately or jointly. The appellant has a heavy burden of showing prejudice when a severance is not granted. United States v. Iacovetti, 466 F.2d 1147 (5th Cir. 1972); United States v. Harris, 441 F.2d 1333 (10th Cir. 1971). The mere fact that the conspiracy involved multitudinous and complex transactions is no reason for this court to reverse the denial of the motion to sever or the alternative motion for a mistrial, or the motion to dismiss.

■■ The testimony of Schilling and that of the later witness Anna Harrison was evidence pointing toward a conspiracy other than that charged in the indictment. However, appellants' reliance upon Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) is misplaced. There the Supreme Court held that the government could not prove one overall conspiracy by showing that there were eight smaller conspiracies; the only nexus among the smaller conspiracies was that one man participated in all of them. The case before us shows at most simply a variance from the indictment, in that there was evidence of a smaller conspiracy *in addition to* the bigger, overall conspiracy. Proof of multiple conspiracies does

---

4. Present at one or more of the meetings between Schilling and Wayman was an unidentified Mr. Thomas and a third individual, also unidentified. One of these unidentified individuals represented that he was vice-president of a bank.

not automatically constitute a fatal variance from a single offense as charged in the indictment. "The true inquiry . . is not whether there has been a variance of proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314, 1318 (1935). This point was recognized by the Court in *Kotteakos*: "Leeway there must be for such cases as the Berger situation and for others where proof may not accord with exact specifications in the indictment." 328 U.S. at 773, 66 S.Ct. at 1252, 90 L.Ed. at 1571. *See also* United States v. Cruz, 478 F.2d 408 (5th Cir. 1973); Grissette v. United States, 313 F.2d 187 (5th Cir. 1963).

Here, as in Robinson v. United States, 333 F.2d 950 (5th Cir. 1964), the appellants make the "somewhat technical argument" that whereas the indictment charged a single conspiracy, the proof adduced by the government showed a separate conspiracy and that a fatal variance resulted. Even if we assume that there was a variance, we must still inquire whether the variance affected the substantial rights of the appellants. In *Robinson* we reiterated our ruling in Jolley v. United States, 232 F.2d 83, 88 (5th Cir. 1960): "If more than one conspiracy was proved, of at least one of which the appellant was guilty, it is clear that there was no variance affecting his substantial rights." We reach the same conclusion in the case now before us. Our case is more like *Berger* than *Kotteakos,* and we find *Berger* controlling.

## IV. CONFLICT OF INTEREST

Appellant Moore seeks reversal because of an alleged conflict of interest which arose because his attorney also represented defendant Ralph Vaughn Thomas. Moore's previous counsel, Mr. Dorsey, had withdrawn from his representation of Moore because of a conflict of interest between his other client and Moore. The trial court appointed Mr. Atkinson to replace Mr. Dorsey. Later in the same day, Mr. Atkinson informed the court that he had been brought into the case only ten days earlier and that because of the allegations in the indictment Mr. Auld (who represented defendant Thomas) would be more familiar with Moore's alleged involvement in the scheme. The court then appointed Mr. Auld.[5]

The mere fact that an attorney jointly represents co-defendants is not, per se, a denial of effective assistance of counsel. United States v. Pinc, 452 F.2d 507 (5th Cir. 1971); Gardner v. Wainwright, 433 F.2d 137 (5th Cir. 1970).

Because his prior attorney had withdrawn due to a conflict of interest, Moore knew that a conflict of interest could arise in the case due to the number of co-defendants and the various defenses that each might assert. Nevertheless, Moore stated to the trial court that he wished to have Mr. Auld as his attorney. This court has recently reiterated its holding that "a trial court does not need to advise a defendant of the right to separate counsel in the event of a conflict of interest between co-defendants,

5. The following discussion occurred:

MR. ATKINSON: Prior to selecting a jury, the Court may wish to go on with the matter about Mr. Auld and myself.

THE COURT: All right, sir. I know of no reason why we shouldn't do that with the jury present, do you?

Mr. Moore and Mr. Auld and Mr. Atkinson, would you please come forward then. Mr. Moore, it has been represented to me during the recess that by reason of the nature of allegations in this complaint that Mr. Auld probably is more familiar with your background or relationship to this

case than Mr. Atkinson; and Mr. Atkinson has indicated a willingness to be released of the appointment which I previously made of him as your attorney. Mr. Auld has indicated a willingness to assume your representation.

Now, is it your wish that I should relieve Mr. Atkinson and appoint Mr. Auld as your attorney?

MR. MOORE: Yes, Your Honor.

THE COURT: All right, sir. Mr. Atkinson, thank you for your services. I appreciate it. You are now relieved from representing Mr. Moore. Mr. Auld, you are now appointed as Mr. Moore's attorney.

where there was neither objection, claim, nor notice to the court of any alleged conflict . . . ." United States v. Boudreaux, 502 F.2d 557, 558 (5th Cir. 1974). Under the circumstances of this case, we find that Moore's acceptance of Mr. Auld was a knowing and intelligent waiver of his right to separate counsel.

■■■■ To warrant a reversal, there must be specific evidence that the defendant was in some way prejudiced by the joint representation. Baker v. Wainwright, 422 F.2d 145 (5th Cir. 1970). Judges are not privy to the aspects of a case not brought out at trial, and there may be facts unknown to the judge but well considered by the attorney that mandate that he conduct his defense in a certain manner; consequently, we must scrutinize any allegation that the defense of one co-defendant was conducted to the detriment of the other co-defendant. We are unwilling to conclude that Mr. Auld's alleged refusal to let Moore testify on his own behalf was the result of a conflict of interest and was prejudicial to him. The fact that defendant Thomas was in a policy-making position while Moore was just a figurehead president does not necessarily constitute any conflict in Mr. Auld's representation of the co-defendants, nor does Moore show how this supposed conflict was resolved to his prejudice. Moore's allegation that during cross-examination only one question was asked concerning him assumes that representation can be measured by the number of questions asked. He fails to show how the extensive cross-examination on the workings of Allied Mortgage was not conducted for the benefit of both co-defendants. See Fryar v. United States, 404 F.2d 1071 (10th Cir. 1968).

**6.** Hutcheson's requests were as follows:

22

There has been proof adduced in this case to the effect that the defendant Hutcheson "checked out" the viability and fiscal responsibility of Marley prior to conducting business with Marley in the following manner:

(1) By obtaining and relying on Dun & Bradstreet reports reflecting Marley's financial posture;

## V. MOTIONS FOR JUDGMENTS OF ACQUITTAL

Both Paul Howard Noe and Victor M. Moore, Jr. appeal from the district court's denial of their motions for judgments of acquittal based upon insufficiency of the evidence.

■■■■ In reviewing a jury verdict of guilty, we, of course, are not free to try the case de novo but are limited to determining where there is sufficient evidence to support the verdict. The rule is well settled that "whether the evidence be direct or circumstantial, the matter is for the jury to decide unless the reviewing court concludes that *no* reasonable mind could find guilt beyond a reasonable doubt," and in so doing the court "must make all reasonable inferences and credibility choices as will support the jury's verdict of guilty." United States v. Squella-Avendano, 478 F.2d 433, 435, 437, (5th Cir. 1973). See also United States v. Warner, 441 F.2d 821 (5th Cir. 1971).

■■■■ We do not choose to burden this opinion with the various facts gleaned from the thirty-one volumes of trial transcript which we feel provide ample basis for the verdicts. Once a conspiracy is shown, "slight evidence" is all that is required to connect a particular person with the conspiracy. Lopez v. United States, 414 F.2d 909, 911 (5th Cir. 1969). Our review of the record convinces us that the verdicts are supported by an abundance of evidence.

## VI. REQUESTS TO CHARGE

### A. *Robert L. Hutcheson*

■■■■ Hutcheson's requests to charge [6] are one-sided and argumenta-

(2) By obtaining and relying on American Express reports bearing on the same issue;

(3) By relying on the report of one Bob McAfee, a mortgage banker with the Citizens & Southern National Bank who issued a favorable report regarding Marley;

(4) By checking with Barclay's Bank in London for the same purpose; and

(5) By otherwise conducting an investigation in order to establish the fact that

tive. Although a defendant is entitled to have the theory of his defense charged to the jury, he is not entitled to have the judge recite all the facts supporting the defense while pointedly ignoring those facts adverse to his position. *Paramount Film Distributing Corp. v. Applebaum*, 217 F.2d 101, 123 (5th Cir. 1954). Hutcheson's requests entirely ignore the important fact, for instance, that he, through his secretary, handled Marley commitments after he knew they were worthless. The district court committed no error in refusing to give Hutcheson's requested charges.

### B. *Paul L. Wayman*

■ Wayman requested that the judge charge the jury on the duties of an escrow holder as follows:

An escrow holder is neither concerned with nor responsible for defects in validity of instruments delivered, nor does he become guarantor or insurer of the truthfulness of representations in the instruments, other than his own special covenants and promises therein contained, or as contained in the escrow agreement by which he is directed to act. Neither is the escrow holder responsible for private understandings which are neither included in the written terms of the escrow as signed by the parties utilizing an escrow, nor in some other way communicated to him as conditions of the escrow either at or prior to the time the escrow is opened.

The judge refused to give the requested charge. A review of the evidence and of the conspiratorial scheme itself convinces us that the district court did not commit reversible error in refusing to give the requested charge.

The briefs do not say, and we fail to find, that Wayman noted an exception to the court's refusal to give the requested charge. But assuming an exception was duly noted, the refusal was not error. The charge as requested may be applicable in civil cases where the legitimacy of the escrow is not in question and there are no charges of fraud and collusion against the escrow holder. The law as stated in the requested charge assumes full honesty and good faith on the part of the escrow holder. That assumption embraces one of the very questions at issue in this criminal trial. The government's theory was that the escrow holder was at the very heart of the conspiracy, knowing all the while that through his cooperation the victims were to be defrauded out of the escrow funds. The requested charge represents only the narrowest view of the functions of an escrow holder and assumes his honesty without even so requiring. We agree with the government's position that the giving of such charge in this case would be akin to charging that the driver of a getaway car in a bank robbery would be acting legally if he simply obeyed all traffic laws.

---

Marley was fiscally responsible in order to honor any take-out commitments it issued.

If you find that the defendant Hutcheson did in fact conduct such investigation and did in fact in good faith rely on the fruit of that investigation, then I charge you that if such findings create in your mind a reasonable doubt as to the defendant Hutcheson's corrupt involvement in any alleged scheme, then you must find the defendant Hutcheson not guilty of the allegations in the indictment relating thereto.

23

The defendant Hutcheson maintains that he in good faith relied on various institutions and individuals all of whom attested to the fiscal responsibility and viability of Morley [*sic*]. If you find that the defendant Hutcheson did in fact in good faith rely on Dun & Bradstreet reports, American Express reports, the report of one Bob McAfee, a mortgage banker with the Citizens & Southern National Bank and/or on any other institutions or persons who are in the business of or able to check out the fiscal responsibility and viability of mortgage lending institutions, and that such reliance was reasonable under the circumstances, and if therefrom there is created in your mind a reasonable doubt as to the guilt of the defendant Robert Hutcheson, then you must find him not guilty of the allegations in the indictment relating thereto.

## VII. REMARKS BY PROSECUTOR IN CLOSING ARGUMENT

 The appellants argue that a remark made by the Assistant U. S. Attorney in closing argument warrants a reversal.[7] Although a prosecutor should not express his personal opinion as to the guilt of a defendant, *based upon facts not in evidence,* this court has not found it to be reversible error for a prosecutor to express his opinion when it is based solely upon evidence adduced at trial. Thompson v. United States, 272 F.2d 919 (5th Cir. 1959); *see also* Schmitt v. United States, 413 F.2d 219 (5th Cir. 1969). Careful analysis of the remark made discloses that government counsel was not even expressing any personal belief in the guilt of the defendants but was simply arguing the weight of the evidence— "the evidence has shown the guilt of these defendants is overwhelming." The argument objected to was, in effect, the same as a previous argument which was not objected to, *viz.,* "We come in and we have put on a case that we think has proved our case beyond a reasonable doubt." The time has not yet come when a prosecuting attorney cannot argue the strength of his case—the weight and sufficiency of the evidence—and ask the jury for a conviction.

## VIII. HUTCHESON'S DOUBLE JEOPARDY CLAIM

Appellant Hutcheson argues that he has been subjected to double jeopardy. He bases this claim upon a former trial in which he was a defendant, United States v. Trans Continental Insurance Co., No. 72–310 (S.D.Fla.). There are two considerations which have led us to conclude that this contention is without merit.

 First, the trial judge in *Trans Continental* declared a mistrial as to Hutcheson and one other defendant when their trial counsel was injured in an automobile wreck and was unable to continue the trial.[8] It is hornbook law that a defendant may be tried a second time when upon the first trial the court properly declared a mistrial. But Hutcheson says that the mistrial was declared without his consent. A broad reading of certain rather casual language in Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) seems to support that argument. Justice Black stated: "This Court, as well as most others, has taken the position that a defendant is placed in jeopardy once he is put to trial before a jury so that if the jury is discharged without his consent he cannot be tried again." The cases cited by Justice Black to support this statement do not warrant such a broad rule. Indeed, he went on to say that "unforeseeable circumstances" might arise during the first trial making its completion impossible, such as the failure of a jury to agree. The broad rule in *Green* was explained just four years later in Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961), wherein the Court said:

> Where for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objections, and he may be retried consistently with the Fifth Amendment.

367 U.S. at 368, 81 S.Ct. at 1526, 6 L.Ed.2d at 904.

We believe that the particular circumstances in *Trans Continental* were such that the trial court was justified in declaring a mistrial.[9]

---

7. "But the Government would ask that you return a verdict of guilty, because I believe the evidence has shown the guilt of these defendants is overwhelming."

8. The government's supplemental brief informs this court that in February 1973 the Florida trial court granted the government's motion to dismiss the *Trans Continental* charges as to Hutcheson.

9. We are informed by brief that the attorney who represented Hutcheson in *Trans Continental* was injured on a Thursday during the third week of trial. The judge declared a mistrial on the following Tuesday when it was evident that the injured attorney (who was still in the hospital) would not recuperate; the judge also concluded that substitute counsel would not suffice in a trial that had been underway for three weeks.

Second, we have looked at the indictment in *Trans Continental* and compared it with the indictment in the case before us. Although both involved similar alleged schemes to defraud, the precise acts involved are different. No victim mentioned in the *Trans Continental* indictment is mentioned in the indictment presently before us. Trans Continental Casualty Company, Ltd. is mentioned in the indictment in our case but only to the extent that the defendants represented it to be a financially sound company with substantial funds available for lending. In our review of the record we do not find that any evidence was presented as to the *Trans Continental* scheme. To support a claim of double jeopardy, Hutcheson must show that the two offenses are in law and in fact the same offense. Dryden v. United States, 403 F.2d 1008 (5th Cir. 1968). The two fraudulent schemes which Hutcheson would have us consider are separate and distinct.

Affirmed.