UNITED STATES of America,
Plaintiff-Appellee,

v.

John L. MORROW et al.,
Defendants-Appellants.

No. 74–2674.

United States Court of Appeals,
Fifth Circuit.

Aug. 16, 1976.

Rehearing and Rehearing En Banc
Denied Oct. 12, 1976.

---

* Rule 18, 5 Cir., see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir. 1970, 431 F.2d 409, Part I.

124

Robert A. Harper, Jr., Gainesville, Fla. (Court-appointed), for Morrow.

Gerald R. Herms, Tampa, Fla. (Court-appointed), for Palmer.

Robert W. Knight, Tampa, Fla. (Court-appointed), for Martin & Ford.

Ollie Ben Butler, Jr., Tampa, Fla. (Court-appointed), for Brennan.

J. Michael Shea, Tampa, Fla. (Court-appointed), for Berman.

Ralph L. Rousseau, Jr., Tampa, Fla., for Johnson.

Henry Gonzalez, James Yon, Tampa, Fla., for Edwards.

Thomas T. Steele, Tampa, Fla. (Court-appointed), for Scales.

Morton Berger, White Plains, N. Y., for Dondich & McConnell.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Claude H. Tison, Jr., Asst. U. S. Atty., Tampa, Fla., for U. S.

Before BROWN, Chief Judge, THORN-BERRY, Circuit Judge, and MILLER *, Associate Judge.

THORNBERRY, Circuit Judge:

Eleven appellants challenge on innumerable grounds their convictions in the Middle District of Florida under a ten count indictment charging conspiracy and substantive offenses. Count One of the indictment charged all appellants, and twelve other original defendants, with conspiracy to defraud the United States and to commit an assortment of substantive crimes, see 18 U.S.C. § 371, including mail fraud and wire fraud, see 18 U.S.C. §§ 1341, 1343, interstate and foreign transportation of counterfeited securities, see 18 U.S.C. § 2314, and the defrauding of federally insured banks. See 18 U.S.C. § 1014. Counts Two through Eight charged appellant Samuel Scales, along with his brother Joseph Scales, with mail fraud, wire fraud, and making false statements to a federally insured bank. Finally, Counts Nine and Ten charged appellants Jack Edwards, Charles Jess Palmer, Allen Christopher Martin, and four other defendants with interstate and foreign transportation of counterfeited securities on two separate occasions.

Three defendants—Schreier, Harte, and Carol Lax—pleaded guilty prior to trial; another defendant, Frank Gallo, died; trial severances were granted for defendants Hahn, Rasmussin, and McClain; and the charges against another defendant, Sam Lax, were dismissed at the request of the Government. Fifteen defendants went to trial on March 4, 1974. Four weeks into the trial, appellant Palmer withdrew his plea of not guilty and entered a plea of guilty to the charges in Counts One, Nine, and Ten. The district court, after the presentation of the Government's evidence, granted the motions of the Scales brothers to dismiss the charges against them in Count Eight. On April 16, 1974, the jury returned guilty verdicts on all counts and against all remaining defendants except one, and the district court shortly thereafter granted a judgment of acquittal *non obstante veredicto* for another defendant. With the exceptions of defendants Meierdiericks and Joseph Scales, all defendants convicted at trial have appealed.

I. *The Evidence Showed a Single Conspiracy.*

All appellants, with the exception of Palmer, argue that a variance between the indictment, which alleged a single conspiracy in Count One, and the proof at trial, which appellants contend showed the existence of several independent conspiracies to the exclusion of a single conspiracy linking all defendants, requires that we reverse, because of fatal prejudice to appellants' substantial rights, the jury's finding of guilty on Count One. At the outset, we concede to appellants the point that the Government's evidence at trial disclosed a variety of criminal activities, at times seemingly unrelated, on the parts of defendants. But we recognize that the evidence also disclosed a not insubstantial expenditure of industry and intelligence by defendants in their criminal endeavors. The multiplicity

* Of the U.S. Court of Customs and Patent Appeals, sitting by designation.

and variety of defendants' criminal activities come accordingly as no surprise. Having carefully examined the record, however, we have no difficulty concluding that the Government's evidence did establish the existence of a single, overall conspiracy among defendants, which conspiracy provided in effect an umbrella and connecting thread for the many different activities disclosed at trial. In consequence, we reject appellants' argument that there was a fatal variance between the indictment and the proof at trial.

The Government's evidence, viewed in the most favorable light, see *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Brasseaux*, 509 F.2d 157, 158 (5 Cir. 1975), established the existence of a national chain, with an international link, for the distribution of stolen and counterfeited securities. In structural terms, which are helpful, but never decisive, see *United States v. Perez*, 489 F.2d 51, 64 (5 Cir. 1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), the flow of counterfeited securities contemplated by the "agreement" of the defendants followed, in the descriptive jargon of the field, an "H-shaped" chain conspiracy—beginning with two groups of "suppliers" operating out of Orlando, Florida, and Chicago, Illinois, passing through a host of "middlemen" or "wholesalers" working principally in Florida, and coming to rest with two groups of "retailers" ready to supply Los Angeles, New York, and Toronto. It must be borne in mind, and it should become clear as the story unfolds, that there was substantial overlap among the links in the conspiracy, which fact among others reinforces our conclusion that the Government did establish the existence of a single conspiracy. *See United States v. Perez, supra* at 59; *United States v. Morado*, 454 F.2d 167 (5 Cir. 1972). But most important in our conclusion that the evidence showed a single conspiracy, we recognize that the character of the property involved here and the nature of the crime are such that knowledge on the part of any one member of the conspiracy concerning the existence and function of other members of the conspiracy, devoted as it was to the illicit distribution of counterfeited and stolen securities, was a permissible inference on the part of the jury. *Cf. United States v. Bruno*, 105 F.2d 921, 922–23 (2 Cir. 1939) (narcotics conspiracy). Independent of any showing of actual knowledge—and the Government made many such showings in this case—the original suppliers knew with substantial certainty that their crime was not complete with the act of counterfeiting. Similarly, the middlemen and retailers properly were charged with knowledge of each other and the original suppliers. Only when the counterfeited and stolen securities came to rest in the hands of unsuspecting members of the public would the force of the criminal conspiracy be spent; all knew this and acted accordingly. *See United States v. Perez, supra* at 59.

We turn first to the alleged suppliers, represented on appeal by Samuel Scales (Orlando), John Brennan (Chicago), and William Berman (Chicago). The Government's evidence—again, in the most favorable light—showed that in early May, 1972, appellant Scales, who was a stock broker in Orlando, fraudulently procured a two-hundred share certificate of stock in Walt Disney Productions with the assistance of his brother, Joseph. Joseph Scales delivered the fraudulently procured, but nevertheless original, certificate in turn to another defendant, Fritz Hahn, for the purposes of counterfeiting. Hahn, after having a printer prepare counterfeits, delivered both the original and counterfeited certificates to Joseph Scales, who on May 15 returned the original to the brokerage house from which it had been obtained by his brother.

In August, 1972, Joseph Scales procured five original $1000 Trans World Airlines bonds through a Jacksonville, Florida, brokerage house. Again working with defendant Hahn, Joseph Scales had 650 counterfeits of the TWA bond prepared by the same printer who had earlier counterfeited the Walt Disney stock. In the following month, September, Hahn contacted defendant Fred Schreier in Orlando and informed him about the counterfeited TWA bonds

and Walt Disney stock. Schreier was provided with two counterfeits of the TWA bond and one counterfeit of the Walt Disney stock in order that he could show the "merchandise" to prospective buyers. Schreier contacted appellant Charles Palmer, showed him the merchandise, and Palmer agreed to join a selling venture.

Contemporary with the Florida counterfeiting operation, the Chicago supply group, which consisted of appellants John Brennan and William Berman, and defendants Frank Gallo and Anthony Brennan, was engaged in the distribution of stolen securities. At an earlier time, Berman and Anthony Brennan had disposed of stolen Oklahoma City Housing Authority bonds and Westinghouse stock through appellant Robert Johnson and defendant Maurice Harte, who both were part of the Florida wholesaling operation that will be described below. Thus, the connecting link between the Chicago suppliers and the Florida wholesalers had been established in the past and was only renewed in the instant case.

Florida middleman, and appellant Jack Edwards provided the link between the two supply groups located in Orlando and Chicago respectively, and with his confederates in Florida, Edwards was the intended conduit for the flow of stolen and counterfeited securities to the retailing groups. Edwards had dealt in the past with the Philip Wilson, a major distributor of illicit securities operating out of St. Louis, and Wilson put Edwards in contact with defendant Carol Lax, a Los Angeles retailer, in midsummer, 1972. Edwards flew to Los Angeles in August for discussions with Carol Lax about a large sale of stolen securities to buyers represented by Lax. A tentative agreement on a sale of stolen Westinghouse, Hoover, and ITT stocks and stolen Oklahoma City Housing Authority bonds was made, but the agreement fell through prior to completion because of infighting among the buyers represented by Lax. Edwards returned to Florida.

Shortly thereafter, however, Lax again contacted Edwards and arranged another meeting in Los Angeles to take place at the end of September. Before he returned to Los Angeles for this meeting, Edwards was introduced by appellant Johnson to defendant Maurice Harte, who was a longtime dealer in illegal securities. Unknown to the other conspirators, Maurice Harte had volunteered his services as a Government informant to minimize the difficulties for his girl friend, who had been arrested for passing a large worthless check. During the course of the conspiracy, Harte, with one important exception, kept the Government informed of all transactions and negotiations among the conspirators, and he allowed his telephone conversations to be tape-recorded during this period. The recorded conversations and Harte's comprehensive testimony at trial provided the foundation for the Government's case.

To obtain merchandise for the upcoming meeting with Lax in Los Angeles at the end of September, Edwards and Harte flew to Chicago where they met with the supply group consisting of Berman, Gallo, and John and Anthony Brennan. Edwards and Harte were provided with a list of stolen securities then available, but they were also informed that payment for any securities on the list would have to be made at the time of delivery. As Edwards, Harte, and the other Florida middlemen did not have the funds to pay for the securities upon delivery, Edwards suggested the following scheme: Edwards at an earlier time had a deal with appellant Lacey Edward Ford (who went by the alias Henry Adams) to purchase large quantities of stolen United States Treasury notes and AT & T stock, but Edwards had been unable to make contact with Ford and consummate the deal. In order to raise the "front money" for the Chicago transaction, the Florida middlemen would obtain stolen stocks from appellant Ford, sell them at a high profit through appellant Johnson's contact man—Sam Scales, and use the profit as front money to the Chicago supply group. This plan of action was agreed upon; Harte returned to Florida to locate Ford; and Edwards flew to Los Angeles to meet with Carol Lax pursuant to their earlier arrangement for a late September meeting. When Edwards

met with Lax in Los Angeles, he informed her that he had three groups of supply for the upcoming transaction—the Chicago supply group, one of the Scales brothers in Orlando, which one he did not say, and a Miami connection.

Upon his return to Florida, Harte located appellant Ford and arranged a meeting at an Orlando restaurant named "Sambo's". Before this meeting took place, Harte had further telephone conversations with appellant Berman regarding the securities currently available from Chicago, flew to Chicago, and picked up a list of these securities. At the first Orlando meeting between Harte and Ford, after his return from Chicago, Harte asked about the Treasury notes and AT & T stock mentioned by Edwards. Ford stated that he did not know what was immediately available, but that he would make further inquiries. After leaving Sambo's, Harte took Ford by appellant Johnson's place of business in Orlando and introduced the latter as a major participant in the venture.

After Edwards had returned to Florida from Los Angeles, Ford contacted Harte and told him that the requested securities would be available. Another meeting at Sambo's was scheduled for October 4. At this meeting, Harte and Edwards talked with Ford, who had brought along defendant McClain. McClain informed Harte and Edwards that some of the Treasury notes had been sold and that none of the AT & T stocks was available, but that he did have approximately $30,000 of mixed stocks. After leaving Sambo's with McClain, Harte examined the stocks that McClain had available, but he determined that they would not be suitable for sale at the high profit needed to raise the Chicago front money. McClain then showed Harte a $1000 TWA bond, which Harte recognized as counterfeit. McClain confirmed that the bond was counterfeit and stated that there were 800 available for distribution. Harte and McClain then returned to Sambo's, by which time appellant Palmer had joined Edwards and Ford. Harte asked Edwards whether the Los Angeles retailers could use

counterfeited stocks, Edwards replied that he was not sure, and the meeting broke up.

During late October and early November, Harte and Edwards were also having discussions with appellants McConnell and Dondich, stock fraud artists working through the office of "International Trust" located in Hollywood, Florida. McConnell and Dondich were seeking watered, stolen, and counterfeited securities as part of their scheme to defraud a Panamanian bank by posting the illegal securities as collateral for a large loan. The discussions between Harte, Edwards, McConnell, and Dondich covered the counterfeited TWA bonds that had been shown to Harte by McClain at the time of the Sambo's meeting in early October. Additionally, at about the same time as the meetings with McConnell and Dondich, Harte again met with Palmer and McClain and was shown a counterfeited two-hundred share certificate of Walt Disney Productions, which Palmer had obtained from defendant Schreier who in turn had been given the certificate for promotional purposes by the confederate of Joseph Scales, Fritz Hahn. Harte later obtained possession of one of the Walt Disney certificates through McClain. He and Edwards then showed the certificate to McConnell and Dondich, and it was agreed at a meeting in early November that McConnell and Dondich could use the stock in the upcoming Panamanian deal, as well as in contemplated ventures in New York and Toronto.

Shortly after this November meeting, Dondich contacted Harte and told him that appellant John Morrow was interested in acquiring some of the counterfeited Walt Disney stock. Harte contacted Morrow. Harte, Edwards, and Morrow met at the offices of "International Trust" in Hollywood, Florida, and Morrow was shown a counterfeited Walt Disney certificate. He stated that he hoped the stock would be suitable for transactions in New York and Los Angeles. Harte provided Morrow with two of the counterfeited certificates for promotional purposes, after receiving assurances from Dondich that Morrow was trustworthy. Approximately one week later,

Harte received the certificates back from Morrow via Dondich.

At another meeting in mid-November, Palmer informed Harte that 350 of the counterfeited TWA bonds were still available, and this information was confirmed at a further meeting. Subsequently Edwards called Harte by phone and stated that he had people in his office who wanted all 800 TWA bonds and 300 one-hundred share certificates of stock in Walt Disney Productions for a pending transaction in Canada. Later in the conversation, which was recorded, Edwards mentioned that Toronto was the place where the transaction was scheduled to take place. Upon receiving this information, Harte again contacted Palmer. Palmer agreed to get in touch with his suppliers. As for Harte, though he was a Government informant, he did not disclose the Canadian deal to the FBI, having decided to join Edwards in the illicit venture.

The pace of negotiations between the conspirators understandably quickened at this point. Edwards was scheduled to go to Toronto the following day, November 28, and it was imperative that the securities package be put together quickly. Harte again contacted Palmer, urging that the counterfeited TWA bonds and Walt Disney stock be procured as soon as possible. At a midnight meeting in the Tampa airport between Edwards and Harte, and before Edwards left for Toronto, the details of the Canadian deal were revealed to Harte: McConnell and Dondich had put Edwards in contact with two people who wanted to use the counterfeits—one of whom was appellant Christopher Martin and the other defendant Meierdiericks; the person on the Canadian end of the deal was identified as Louis Marks, though his real name was Louis Marder.

On November 28, Edwards, who had flown out of Tampa, contacted Harte from Chicago and inquired about the efforts to put the securities package together. Harte told Edwards that he would have the securities together shortly and would fly to Toronto on the afternoon of the following day. On the 28th appellant Martin and defendant Meierdiericks flew to Toronto; they were, as noted above, in contact with Edwards and in effect were the American end of the Canadian deal. Martin and Meierdiericks checked into the same hotel as Edwards and shared a room adjacent to Edwards's room. Edwards called Harte from Toronto and told him that the deal was ready to go, but Harte stated that he would need more time, approximately two or three days, to put together the complete package of desired securities. Harte made arrangements to fly to Toronto the next day, however, with samples of the counterfeited TWA bonds and Walt Disney stock.

On the morning of the 29th, Edwards, Martin, Meierdiericks, and Louis Marks met in the hotel coffee shop. After the meeting broke up, the Americans went to several commercial establishments in Toronto to procure supplies needed for the transaction—blank power of attorney forms (stock transfer forms) and a typewriter. Later the same day, Harte accompanied by Palmer arrived in Toronto. He proceeded to the hotel, where the samples were shown to Martin, Meierdiericks, and Marks. All agreed that the counterfeited TWA bonds and Walt Disney stock would be suitable for the transaction. Edwards told Harte that a full order was needed—800 TWA bonds and 300 one-hundred share certificates of Walt Disney Productions. Harte replied, however, that only 165 TWA bonds were currently available. He did inform Edwards that a virtually unlimited supply of two-hundred share certificates of the Walt Disney stock was available for the Canadian deal. After further negotiations between the conspirators, it was agreed that the two-hundred share certificates would be used in the transaction.

Palmer and Harte returned to Florida to pick up the currently available stock for the Canadian deal, planning to return to Toronto on the following day. Defendant Fred Schreier, who had obtained the counterfeited stocks and bonds from Fritz Hahn and Joseph Scales, delivered 165 TWA bonds for the Canadian deal to Palmer's residence.

Women messengers brought the bonds in a shoe box to the Orlando airport, where the box was handed over to Palmer and Harte. The pair then flew back to Toronto. Harte and Palmer planned to return to Florida one more time to obtain the Walt Disney stock.

Back in Toronto, Harte and Palmer met Edwards at the hotel. After some difficulty obtaining an adequate typewriter and after hiring a temporary secretary, they began filling out the transfer forms that had been purchased earlier in the day. Unknown to Edwards, Harte, Martin, Palmer, and Meierdiericks, all of whom were in the Toronto hotel room, Louis Marks was actually an informant for Canadian law enforcement officials. The same afternoon the Royal Canadian Mounted Police raided the adjacent hotel rooms in Toronto and arrested Edwards, Harte, Martin, Palmer, and Meierdiericks. In the course of the raid, the counterfeited securities and other incriminating evidence were seized and ultimately turned over to American law enforcement officials. With the Canadian raid, the conspiracy collapsed and the instant prosecution commenced.

Some appellants argue that the existence of two groups of suppliers—Orlando and Chicago—and two groups of retailers—Lax in Los Angeles and McConnell and Dondich working out of Florida—destroyed the commonality of purpose and design need to establish the existence of a single overall conspiracy. Other appellants argue that the evidence of isolated criminal schemes engaged in by some of the defendants demonstrated the existence of multiple conspiracies to the exclusion of a single conspiracy. We disagree with both contentions. *See United States v. Bruno, supra.* The Chicago supply group, through the Florida middlemen, would furnish stolen securities to the retail buyers in Los Angeles represented by Carol Lax. The Chicago supply group, however, required payment for the

stolen securities "up front" from the Florida middlemen. At this point, the Orlando supply group enters the picture. They would, and did, furnish the counterfeited securities for the Canadian "front money" deal, which deal required the participation of the second group of retailers headed by McConnell and Dondich. The participation of the Orlando suppliers and the second retailer group was an essential element in the Chicago-Los Angeles deal arranged by the *same* Florida middlemen.

Notwithstanding that the evidence showed some isolated schemes on the part of some defendants, the singleness of purpose in the larger conspiracy depicted by the Government's evidence is manifest. We hold that the evidence at trial, viewed in the light most favorable to the Government, established a single overall conspiracy in which defendants joined to distribute illicit securities in foreign and interstate commerce. Accordingly, we reject appellants' argument that there was a fatal variance between the indictment and the proof at trial.[1]

II. *The Evidence was Sufficient to Sustain the Convictions.*

■ With the exceptions of Edwards, Palmer, and Berman, all appellants challenge the sufficiency of the evidence underlying their convictions. On appeal we are compelled, of course, to view the evidence in the light most favorable to the Government. *See Glasser v. United States, supra; United States v. Moore,* 505 F.2d 620, 623 (5 Cir. 1974), *cert. denied,* 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975). And in conspiracy cases, we will affirm a jury's finding of guilty if our review of the record below discloses at least slight evidence linking a particular defendant to a conspiracy that has been established by other independent evidence. *See, e. g., United States v. Lawson,* 523 F.2d 804, 807 (5 Cir. 1975);

---

1. In view of our holding above, the district court did not err in refusing to specially instruct the jury on the issue of multiple conspiracies. Moreover, we have examined all the instructions given by the district court in the instant case, particularly on the conspiracy count, and find them more than adequate to the task of guiding the jury through the evidentiary labyrinth erected in the six week trial below.

*United States v. Reynolds,* 511 F.2d 603, 607 (5 Cir. 1975); *United States v. McGann,* 431 F.2d 1104, 1107 (5 Cir. 1970), *cert. denied,* 401 U.S. 919, 91 S.Ct. 904, 27 L.Ed.2d 821 (1971). We have no occasion to consider the sufficiency of the evidence against appellants McConnell and Dondich as we reverse their convictions on separate grounds in Section V below. But with the slight evidence standard in mind, we turn to the evidence against appellants Brennan, Martin, Morrow, Johnson, Ford, and Scales.

■ A. *John Brennan.* The Government's evidence established that appellant Brennan was a member, along with his nephew Anthony Brennan, William Berman, and Frank Gallo, of the Chicago supply group that would furnish stolen securities, through the Florida middlemen, to Carol Lax and her buyers in Los Angeles. As the Government appreciates, appellant Brennan is not arguing that the person named "John Brennan" who dealt with Edwards and Harte in Chicago was not a member of the conspiracy. Rather, appellant asserts that he is not the same John Brennan. The argument is without merit. Notwithstanding the inability of Government witness Harte to make a positive in-court identification of appellant, there was still sufficient evidence to support the jury's conclusion, reflected in its verdict, that the John Brennan in Chicago was the same John Brennan brought to trial by the Government. First, Government witness Harte did testify that the "Mr. Brennan" he met briefly in Chicago was approximately fifty years old; this testimony excluded the possibility that Harte was mistakenly dealing with appellant's nephew, who was a much younger man; and the members of the jury were able to observe appellant and determine whether Harte's testimony about age conformed to their own observations. Second, and more decisive, the trial testimony of Anthony Brennan, appellant's nephew, supported the conclusion that the Government had brought the correct person to trial. Anthony Brennan testified, among other things, that the securities included on a list of available "merchandise" provided to Harte by appellant Berman were the same securities that he had discussed with his uncle in connection with a possible bank fraud. That a different "John Brennan" was involved with the Chicago supply group is a proposition that, for good reason, was discarded by the jury. And though the jury was not informed of the following, we take particular notice of the Government's thwarted attempt to introduce evidence showing that appellant's appearance had radically changed in the year prior to trial. In these circumstances, the inability of Harte to make an in-court identification is understandable. The evidence was sufficient to sustain the jury's verdict against appellant Brennan.

B. *Allen Christopher Martin.* The Government's evidence established without question that appellant Martin was one of the key figures in the Canadian "front money" transaction. Appellant Martin, along with defendant Meierdiericks, provided the link between McConnell and Dondich in Florida and Louis Marder in Canada. The evidence of appellant's guilt on Counts One, Nine, and Ten was overwhelming. His conviction is affirmed.

■ C. *John Morrow.* In November, 1972, Dondich informed Harte that appellant Morrow was interested in obtaining some of the counterfeited Walt Disney certificates that Harte and Edwards were to supply to McConnell and Dondich in connection with the Canadian transaction. Harte contacted Morrow, and together with Edwards, the three met at McConnell and Dondich's office in Hollywood, Florida. Morrow was shown the Walt Disney certificate and expressed his hope that the certificates would be suitable for pending transactions in New York and Los Angeles. Morrow was given two of the counterfeited certificates to show his buyers, and the certificates were returned to Harte through Dondich about one week later. The Government argues, and we agree, that it was not necessary for the evidence to show that appellant Morrow was a "driving force" in the conspiracy; the evidence was sufficient, however, to sustain the jury's

determination that appellant joined the conspiracy. *See United States v. Morado,* 454 F.2d 167, 168–72 (5 Cir. 1972). We affirm appellant's conviction.

■ D. *Robert Hite Johnson.* The Government's evidence, principally the trial testimony of Maurice Harte, portrayed appellant Johnson as a major participant in the conspiracy. It was Johnson who introduced Edwards and Harte when Edwards was seeking stolen securities for the deal with Carol Lax in Los Angeles; he provided Harte with a pre-paid airline ticket to Chicago for the latter's meeting with John and Anthony Brennan, Berman, and Gallo; he assured Edwards and Harte before the October 4 meeting at Sambo's that he could dispose of any securities they obtained through Samuel Scales in Orlando; and he was the first to be shown the counterfeited TWA bond by Harte in late October. Appellant Johnson's guilt was clear, and we affirm his conviction.

E. *Lacey Edward Ford.* The Government's case against appellant Ford was somewhat weaker than that against the appellant's discussed above. We conclude nevertheless that the evidence was sufficient to support the jury's finding of guilt. Appellant Ford, as the Government argues, was an essential "contact man" between Palmer, who was the link to the Orlando suppliers, and Edwards and Harte, the Florida middlemen. Harte sought out Ford as a source of illicit securities for the pending "front money" transaction necessitated by the demands of the Chicago suppliers for payment in advance on the stolen securities that would be sold to Carol Lax in Los Angeles. During an initial meeting at Sambo's, after Harte returned from Chicago with the list of available securities, Ford told Harte that he would make inquiries on the availability of stolen Treasury notes and AT & T stocks. After this meeting, Harte introduced appellant Ford to Johnson. Ford contacted Harte, after Edwards had returned from Los Angeles, told him that the requested securities were available, and arranged another meeting at Sambo's for October 4. At the October 4 meeting,

Ford brought along McClain, who, along with Palmer, ultimately supplied the counterfeited securities for the Canadian venture. Ford was thus a crucial link in the conspiracy. The evidence was sufficient to sustain his conviction. The Government established the conspiracy by strong independent evidence; it only required slight evidence to link Ford to the conspiracy. We affirm the conviction.

F. *Samuel Scales.* Appellant Scales was a stockbroker with Reynolds & Company in Orlando, Florida. On April 13, 1972, he placed a buy order for 700 shares of Natomas stock for the account of his brother Joseph, delivery at the State Bank of Jacksonville for a price of $54,600. On May 9 appellant prepared a transfer form rescinding the Natomas order because of "customer error" and transferring the shares to his own account at the Commercial Bank of Apopka, Florida. The transfer form required approval by the resident manager of Reynolds & Company in Orlando, and the resident manager's initials appear on the transfer form. The Government established at trial, however, that the initials were a forgery.

On May 2, before he executed the transfer form for the Natomas stock, appellant placed another buy order for 300 shares of Walt Disney Productions for the account of his brother. Two days later appellant executed a sell order for the same Walt Disney stock. When the New York office of Reynolds & Company received the buy order, the Walt Disney stock—a one-hundred share certificate and a two-hundred share certificate—was forwarded to the State Bank of Jacksonville and received on May 10 or 11. Joseph Scales was notified of the stock's arrival, went to the bank, and received the shares in return for his check drawn in the amount of $50,300. Joseph Scales then met with defendant Fritz Hahn to make arrangements for the counterfeiting of the two-hundred share certificate. After counterfeited copies were prepared, Joseph Scales returned the two certificates to the Jacksonville office of Reynolds & Company. The stock was then returned to Reynolds &

Company's New York office pursuant to the May sell order executed by appellant.

Sometime later in May the Natomas stock, which appellant had ordered for his brother's account and then transferred to his account, arrived at the Commercial Bank of Apopka. Appellant attempted to secure a loan from the Commercial Bank to pay for the Natomas stock, but the bank was unwilling to accept the stock itself as the only collateral—the market price of the Natomas stock had declined substantially from the time when appellant had placed his original buy order. After making arrangements to secure the loan with Walt Disney stock as additional collateral, however, appellant received a loan from the Commercial Bank in the amount of $54,600, the full price of the Natomas stock. Appellant and his brother were both present at the time the loan was made, and it was appellant's brother who produced the Walt Disney stock that the bank accepted as collateral—a two-hundred share certificate—from his brief case. The share was counterfeited, of course. The Commercial Bank later, on May 31, made a consolidation loan for appellant, and the counterfeited Walt Disney certificate was used again as collateral. Over the summer, appellant defaulted on the loan, and in September the bank sold the Walt Disney certificate to recover its loss. Shortly thereafter, the certificate was discovered to be counterfeited, and the bank reimbursed the purchaser.

In addition to his conviction on six counts charging mail fraud, wire fraud, and making false statements to a federally insured bank, appellant Scales, along with his brother, was convicted of conspiracy. Appellant argues in this court (1) that the Government's evidence was insufficient to show that he was aware of the counterfeit character of the Walt Disney stock at the time it was pledged to the Bank of Apopka, and (2) that the Government's evidence was also insufficient to connect him with the conspiracy charged in Count One and, therefore, the hearsay testimony of Carol Lax and Maurice Harte was inadmissible to further link him to the conspiracy.

After consideration of all the Government's evidence, we reject appellant's first argument. Clearly, there was sufficient evidence for a reasonable jury to conclude that appellant was aware of the counterfeit character of the Walt Disney certificate at the time the Bank of Apopka extended him the loan. The Government showed that the initials on the transfer form that appellant prepared on May 9 were a forgery. The transfer form was for the Natomas stock, which appellant purchased with the funds provided by the Bank of Apopka and secured by the Walt Disney certificate. The jury could conclude reasonably that appellant forged the resident manager's initials on the transfer form. Appellant executed a sell order covering the Walt Disney stock on May 4, two days after he purchased the stock; he pledged a counterfeited copy of the *same* stock on May 24. Appellant never took the stand and, thus, offered no explanation to dispel the appearance created by the Government's evidence that he was pledging the same stock that he had sold three weeks earlier. *Cf. Barnes v. United States,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973). It was appellant Scales, and not his brother Joseph, who first suggested to officials of the Bank of Apopka that the Walt Disney stock would be available to secure the loan for the purchase price of the Natomas stock. Finally, when appellant defaulted on the loan, he was notified by the bank that the Walt Disney certificate would be sold to recover the loss on the loan. Appellant notified bank officials that they should not sell the certificate as it was "no good". Appellant suggests in his brief that he only discovered that the certificate was "no good" after the time of the pledge. There was no direct evidence to demonstrate the extent of appellant's knowledge on May 24 when the pledge was made. But from the convincing circumstantial evidence introduced by the Government—particularly, the forgery on the transfer form—we conclude that the evidence was sufficient to support appellant's conviction on the six substantive counts.

■ We are unable to conclude, however, that the Government's evidence was sufficient to connect appellant to the conspiracy charged in Count One. Though we will affirm a conviction where our review of the record reveals only slight evidence connecting a particular defendant to a conspiracy established by independent evidence, a showing of mere association with one of the conspirators is not sufficient itself to convict. *See, e. g., United States v. Oliva,* 497 F.2d 130, 134 (5 Cir. 1974); *United States v. Martinez,* 486 F.2d 15, 24 (5 Cir. 1973). Moreover, the hearsay testimony of Carol Lax and Maurice Harte bearing on appellant's participation was not admissible against appellant until the Government was able to link appellant to the conspiracy by other evidence. *See, e. g., United States v. Apollo,* 476 F.2d 156, 163 (5 Cir. 1973). From a review of the record, we are unable to find sufficient evidence linking appellant

Scales to the conspiracy. Appellant's conviction for conspiracy under Count One is reversed.

### III. *The Motions for Severance.*

■ Five appellants argue that the district court erred in refusing to grant their motions for severance filed pursuant to Fed.R.Crim.P. 14.[2] Before entering upon a discussion of the various arguments tendered by appellants, it should be emphasized that the grant or denial of a motion for severance rests in the sound discretion of the trial judge.[3] Consistent with this discretion, which is necessarily wide,[4] appellants carry a heavy burden to show that the denial of their motions for severance also denied them a fair trial.[5] Absent an abuse of discretion, the ruling of the trial judge will not be disturbed on appeal.[6]

Appellant Samuel Scales challenges the district court's denial of his pre-trial motion

---

2. The rule provides as follows:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

3. *E. g., United States v. Howell,* 514 F.2d 710, 715–16 (5 Cir. 1975); *United States v. Crockett,* 514 F.2d 64, 70 (5 Cir. 1975); *United States v. Miller,* 513 F.2d 791, 793 (5 Cir. 1975); *United States v. Pearson,* 508 F.2d 595, 597 (5 Cir. 1975); *United States v. Hill,* 495 F.2d 1245, 1247 (5 Cir. 1974); *United States v. Burke,* 495 F.2d 1226, 1233–34 (5 Cir. 1974); *United States v. Martinez,* 486 F.2d 15, 22 (5 Cir. 1973); *Gordon v. United States,* 438 F.2d 858, 878 (5 Cir. 1971); *United States v. Valdez,* 418 F.2d 363, 364 (5 Cir. 1969); *Barnes v. United States,* 374 F.2d 126, 127 (5 Cir.), *cert. denied,* 389 U.S. 917, 88 S.Ct. 246, 19 L.Ed.2d 273 (1967); *Peterson v. United States,* 344 F.2d 419, 422 (5 Cir. 1965); *United States v. Garrison,* 348 F.Supp. 1112, 1124 (E.D.La.1972).

4. *United States v. Eastwood,* 489 F.2d 818, 822 (5 Cir. 1973). *See also* M. Frankel, *The Adversary Judge,* 54 Tex.L.Rev. 465 (1976).

5. *United States v. Burke,* 495 F.2d 1226, 1234 (5 Cir. 1974); *United States v. Martinez,* 486 F.2d 15, 22 (5 Cir. 1973); *see, e. g., United States v. McGruder,* 514 F.2d 1288, 1290 (5 Cir. 1975); *United States v. Wayman,* 510 F.2d 1020, 1024 (5 Cir. 1975); *United States v. Eastwood,* 489 F.2d 818, 822 (5 Cir. 1973); *United States v. Perez,* 489 F.2d 51, 65 (5 Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *Tillman v. United States,* 406 F.2d 930, 936 (5 Cir.), *cert. denied in part, vacated and remanded in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969); *Garnett v. United States,* 404 F.2d 26, 27 (5 Cir. 1968); *Smith v. United States,* 385 F.2d 34, 38 (5 Cir. 1967).

6. *E. g., Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Miller,* 500 F.2d 751, 760–61 (5 Cir. 1974); *United States v. Laca,* 499 F.2d 922, 926 (5 Cir. 1974); *United States v. Hamilton,* 492 F.2d 1110, 1112 (5 Cir. 1974); *United States v. Abshire,* 471 F.2d 116, 118 (5 Cir. 1972); *United States v. Blanchette,* 453 F.2d 859, 860 (5 Cir. 1972); *United States v. Wilson,* 451 F.2d 209, 215 (5 Cir. 1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1298, 31 L.Ed.2d 490 (1972); *Leach v. United States,* 402 F.2d 268 (5 Cir. 1968), *cert. denied,* 393 U.S. 1082, 89 S.Ct. 864, 21 L.Ed.2d 775 (1969); *Smith v. United States,* 385 F.2d 34, 37 (5 Cir. 1967).

for severance with the argument that had he been tried separately, he could have called his brother and co-defendant, Joseph Scales, as an exculpatory witness. Appellant asserts in his brief that Joseph Scales could have testified that appellant was unaware of the counterfeit character of the Walt Disney stock that appellant pledged as collateral with the Bank of Apopka in May, 1972. *See* Brief for Appellant Scales at 15–16. In his pre-trial motion for severance, by contrast, appellant Scales restricted his argument in support of severance to vague and general allegations of the prejudice that would inhere in a joint trial of all defendants; the motion did not allege at any point that the testimony of co-defendant Joseph Scales was desired.[7]

■ The decisions of this circuit in *Byrd v. Wainwright*, 428 F.2d 1017 (5 Cir. 1970), and *United States v. Martinez*, 486 F.2d 15 (5 Cir. 1973), considered in some detail the allegations that must be included in a motion for severance grounded on the claim that a joint trial will preclude a proffer of exculpatory testimony from a co-defendant.[8] Movant must establish to the satisfaction of the trial judge that the testimony in question is exculpatory in effect and that the designated co-defendant will in fact testify at a separate trial.[9] The trial judge is expressly empowered to examine

the significance of the alleged exculpatory testimony in relation to the defensive theories relied upon and assess the extent to which the defendant will be prejudiced by the absence of the testimony.[10] Moreover, close attention to the interest in judicial economy is a permissible consideration in the trial judge's exercise of discretion.[11]

■ As indicated above, the pre-trial motion for severance filed by appellant Scales contained no hint of a desire to call Joseph Scales as an exculpatory witness, and the motion, by default, failed to satisfy the minimal standards of specificity announced in *Byrd* and *Martinez*. Our examination of the record discloses no instance where appellant presented to the district court the theory he now argues on appeal. This antecedent defect in appellant's severance argument precludes an initial consideration on the merits at this late date. On this basis, we affirm the district court's denial of appellant Scales' motion for severance.[12]

■ Appellants Edwards and Morrow, urging between themselves substantially similar arguments, attack the district court's refusal to grant their motions for severance. As an initial matter, both appellants contend that the complexity of the Government's case—twenty-three defend-

---

7. *See* Record on Appeal, Vol. I, at 27. The only reference to co-defendant Joseph Scales in appellant's pre-trial motion for severance is the allegation that "the sole purpose of including SAMUEL C. SCALES in the Indictment and Information filed against him is to assist the Government in the prosecution of Joseph Hugh Scales, through the name association and relationship of these two defendants."

8. Post-*Byrd* and *Martinez* decisions have further illumined the allegations required for a successful motion for severance where the testimony of a co-defendant is desired. *See, e. g., United States v. Diez*, 515 F.2d 892, 903 (5 Cir. 1975); *United States v. Burke*, 495 F.2d 1226, 1233–34 (5 Cir. 1974).

9. In accordance with this directive, movant must make a clear showing of what his co-defendant would testify to in the later trial, though it is not required that movant present an affidavit under oath from his co-defendant. Movant also need only demonstrate a "likelihood" of future testimony by his co-defendant,

and movant's attorney need not testify under oath or by affidavit that he will call the co-defendant as a witness in a separate trial. *United States v. Diez*, 515 F.2d at 903; *United States v. Burke*, 495 F.2d at 1234; *United States v. Martinez*, 486 F.2d at 22; *Byrd v. Wainwright*, 428 F.2d at 1020.

10. *United States v. Martinez*, 486 F.2d at 22; *see United States v. Burke*, 495 F.2d at 1234; *Byrd v. Wainwright*, 428 F.2d at 1021.

11. *United States v. Diez*, 515 F.2d at 903; *United States v. Burke*, 495 F.2d at 1234; *United States v. Johnson*, 478 F.2d 1129, 1134 (5 Cir. 1973); *Byrd v. Wainwright*, 428 F.2d at 1020.

12. *See United States v. Henderson*, 489 F.2d 802, 806 (5 Cir. 1973), *cert. denied*, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974); *cf. McKissick v. United States*, 379 F.2d 754, 759 (5 Cir. 1967).

ants, all charged in a single conspiracy count, with only certain defendants charged in nine substantive counts—prevented the jury from rationally assessing guilt on an individual basis, even when aided by precise instructions from the bench. We reject this argument. The general rule remains that persons jointly indicted should be tried together,[13] and we perceive no substantial reason to depart from the general rule in this case.

In reviewing a claim of undue complexity and confusion, an appellate court looks to the totality of the circumstances [14] in striking a balance between the interest in judicial economy and the need to protect the rights of the individual defendant.[15] A joint trial of twenty-three defendants, charged with conspiracy and numerous substantive counts, clearly raised the possibility that the jury might cumulate the evidence introduced by the Government on all counts and against all defendants to find guilty a defendant whose connection with the conspiracy was at best marginal. The pernicious effect of cumulation, however, is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the Government.[16] The remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction. Where the Government charges a single conspiracy, as it did here, much of the evidence introduced ultimately bears, at least indirectly, on the agreement of the co-conspirators. Once the Government has satisfactorily established the existence of the conspiracy, the same evidence used to convict a particular defendant is admissible against all co-defendants shown to be members of the conspiracy.[17] Given this state of affairs, the interest in judicial economy understandably exerts strong pressures in favor of a joint trial.[18]

From our examination of the record as a whole, we are convinced that the trial judge clearly and adequately instructed the jury in a way that minimized the possibility that the jury might cumulate the Government's evidence.[19] Appellants have failed to dem-

**13.** *United States v. Perez,* 489 F.2d 51, 65 (5 Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *see, e. g., Gordon v. United States,* 438 F.2d 858, 878 (5 Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971); *Tillman v. United States,* 406 F.2d 930 (5 Cir.), *cert. denied in part, vacated and remanded in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969); *cf. Kotteakos v. United States,* 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed.2d 1557 (1946) ("When many conspire, they invite mass trial by their conduct.").

**14.** *E. g., Gordon v. United States,* 438 F.2d 858, 879 (5 Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971); *Peterson v. United States,* 344 F.2d 419, 422 (5 Cir. 1965); *West v. United States,* 311 F.2d 69, 70 (5 Cir. 1962).

**15.** *United States v. Perez,* 489 F.2d 51, 64 (5 Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *see, e. g., United States v. McGruder,* 514 F.2d 1288, 1290 (5 Cir. 1975); *United States v. Crockett,* 514 F.2d 64, 70 (5 Cir. 1975); *United States v. Pearson,* 508 F.2d 595, 597 (5 Cir. 1975); *United States v. Wilson,* 451 F.2d 209, 215 (5 Cir. 1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1298, 31 L.Ed.2d 490 (1972).

**16.** *See, e. g., United States v. Crockett,* 514 F.2d 64, 71 (5 Cir. 1975); *United States v. Abshire,* 471 U.S. 116, 119 (5 Cir. 1972); *United States v. Harris,* 458 F.2d 670, 673 (5 Cir. 1972); *Gordon v. United States,* 438 F.2d 858, 873–74 (5 Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971); *cf. Leach v. United States,* 402 F.2d 268 (5 Cir. 1968), *cert. denied,* 393 U.S. 1082, 89 S.Ct. 864, 21 L.Ed.2d 775 (1969).

**17.** *E. g., United States v. Pearson,* 508 F.2d 595, 597 (5 Cir. 1975); *United States v. Perez,* 489 F.2d 51 (5 Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *United States v. Garrison,* 348 F.Supp. 1112, 1124 (E.D.La.1972).

**18.** *E. g., United States v. Diez,* 515 F.2d 892, 903 (5 Cir. 1975); *United States v. Martinez,* 486 F.2d 15, 23 (5 Cir. 1973); *Milam v. United States,* 322 F.2d 104, 110 (5 Cir. 1963), *cert. denied,* 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181 (1964).

**19.** Early in the trial, on March 6, 1974, the district court instructed the jury as follows:

Ladies and gentlemen, if I might have your attention for a moment before we continue with the testimony of this witness, there is some instruction that I wish to give you very briefly at this time in the trial of the case with respect to your consideration of testi-

onstrate with particularity the compelling prejudice that must be present before we will reverse a district court's severance decision. Whatever confusion remained after the jury was properly instructed was not so great that appellants were denied a fair trial.

As a second line of argument, appellants assert that the quantity of evidence introduced against them was *de minimus* in relation to the evidence introduced against the other defendants and that they were prejudiced by this disparity. The argument is simply a variation on the argument of undue complexity rejected above; the assumption, at least, is that the jury was incapable of following its instructions to limit an assessment of guilt to the evidence properly admissible against a particular defendant. Severance under Fed.R. Crim.P. 14 is an appropriate remedy for a disparity in the evidence only in the most extreme cases.[20] The situation of appellants was by no measure extreme. As for appellant Edwards, we agree with the Government that the alleged disparity in the evidence simply does not exist. Edwards was a central figure in the conspiracy, and the evidence of his guilt was overwhelming. Appellant Morrow, on the other hand, presents a somewhat closer case. To substantiate the alleged disparity in the quantity of evidence introduced against him in relation to that introduced against the other defendants, appellant Morrow points to the scanty twenty-five pages of transcript devoted to testimony concerning his activities out of a total record of over fifty volumes. Needless to say, more is required to overturn on appeal the district court's exercise of discretion in denying a motion for severance.[21] It is not enough for appellant merely to show that he might have had a better chance at acquittal if tried separately.[22] We have held already that the evidence introduced by the Government and properly admissible against appellant Morrow was sufficient to sustain the jury's determination of guilt. Given the adequate and unambiguous instructions to the jury and the failure of appellant to demonstrate prejudice so extreme that it denied him a fair trial, we are of the view that the sufficiency of the evidence to support the finding of appellant's guilt foreclosed as a matter of law his argument that the district court abused its discretion in denying the motion for severance.

Appellants Edwards and Morrow tender one final argument in challenging the deni-

---

mony from this or any other witness with respect to what others may have said. And your instruction on the law that you should follow with regard to such testimony is as follows:

Whenever it appears *beyond a reasonable* doubt from the evidence in the case that a conspiracy existed and from independent evidence of his own conduct that a defendant was one of the members of the alleged conspiracy, then the statements thereafter knowingly made and the acts thereafter knowingly done by any person likewise found to be a member may be considered by the Jury as evidence in the case as to the Defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the Defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy and in furtherance of some object or purpose of the conspiracy.

Otherwise, any admission or statement made or act done outside of court by one person may not be considered as evidence against any person who was not present and did not hear the statement made or see the act done.

Therefore, statements of any alleged conspirator which are not in furtherance of the conspiracy or made before its existence or after its termination may be considered as evidence only against the person making them.

First Supp. Record on Appeal, Vol. V, at 18–19. As the Government points out, the district court repeated this instruction on an almost daily basis throughout the trial.

20. See, for example the decision of the Second Circuit in *United States v. Kelly,* 349 F.2d 720, 759 (2 Cir. 1965), where it was held to be an abuse of discretion to deny severance for a defendant whose name was first mentioned three months into a nine month trial and only sporadically thereafter.

21. *See United States v. McGruder,* 514 F.2d 1288, 1290 (5 Cir. 1975).

22. *E. g., United States v. Abshire,* 471 F.2d 116, 118 (5 Cir. 1972).

al of their motions for severance: they contend that the Government's evidence established multiple conspiracies, rather than the single conspiracy charged in the indictment, and that the variance between the indictment and the proof necessitated a severance of the trial along structural lines.[23] In view of our holding that the Government's evidence was sufficient to support the jury's finding of a single conspiracy, we reject appellant's argument.[24]

Appellants Brennan and Berman seek reversal of the district court's denial of their motions for severance with the argument that the entrapment defense used by appellant Edwards unduly prejudiced those defendants, including Brennan and Berman, who pleaded not guilty. Additionally, appellants Brennan and Berman contend that they should have been permitted simultaneously to plead entrapment and nonparticipation in the conspiracy. For the reasons that follow, we affirm the district court's denial of the motions for severance.

The inconsistency, if any, between the defense of entrapment relied on by one defendant and the defense of nonparticipation argued by one or more co-defendants in a multi-member conspiracy case has never been viewed by itself as necessitating severance under Fed.R.Crim.P. 14. In all cases where a co-defendant pleads an allegedly inconsistent defense, such as entrapment, it is still incumbent upon the movant for severance to demonstrate a spe-

cific and compelling prejudice arising out of the inconsistency.[25] Appellants Brennan and Berman have not made this threshold showing. Indeed, from our examination of Edward's in-court testimony, we are constrained to agree with the Government that the testimony does not at any point contradict appellant's defense of nonparticipation in the conspiracy. In consequence, appellants' reliance on the decisions in *Schaffer v. United States,* 221 F.2d 17 (5 Cir. 1955), and *Barton v. United States,* 263 F.2d 894 (5 Cir. 1959), is misplaced. Both *Schaffer* and *Barton* raised the problem of severance in the face of a co-defendant's statements that clearly and directly implicated the movant, and in both cases we held that the district court abused its discretion in denying the motion for severance. The in-court testimony of appellant Edwards did not implicate, directly or indirectly, either Brennan or Berman.

Aside from a narrow exception, the clear rule in this circuit forbids a defendant from pleading entrapment and nonparticipation in the alternative.[26] In *Sears v. United States,* 343 F.2d 139, 143–44 (5 Cir. 1965), we held that a defendant may argue simultaneously that he was not a member of the conspiracy and that he was entrapped to commit the overt acts charged in the indictment. The holding in *Sears* is limited, however, to the situation where the Government's own case in chief injects substantial evidence to support a theory of

---

**23.** Appellant Morrow suggests that three separate trials should have been conducted by the district court. Inasmuch as appellants have failed to demonstrate the requisite prejudice to overturn the district court's exercise of discretion, we have no occasion to consider appellant Morrow's suggestion.

**24.** In *United States v. Dryden,* 423 F.2d 1175 (5 Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970), defendants were convicted of conspiracy to violate revenue laws relating to distilled spirits, and on appeal it was argued that the district court erred in denying severance under Fed.R.Crim.P. 14 when the evidence showed multiple conspiracies while the indictment charged a single conspiracy. Independently of its conclusion that the evidence established a single conspiracy, the court in *Dryden* characterized appellant's argument

as a "perversion" of the fatal variance argument and treated the argument as inapplicable in a review of the severance decision. The *Dryden* court did hold, in the alternative, that its finding that the evidence showed a single conspiracy foreclosed appellant's argument. It is on the latter reasoning, as indicated above, that we reject the variance argument of appellants Edwards and Morrow.

**25.** *See, e. g., United States v. Eastwood,* 489 F.2d 818, 822 (5 Cir. 1973); *United States v. Pickle,* 424 F.2d 528 (5 Cir. 1970); *Marko v. United States,* 314 F.2d 595 (5 Cir. 1963).

**26.** *See, e. g., United States v. Russo,* 455 F.2d 1225, 1226–27 (5 Cir. 1972); *United States v. Groessel,* 440 F.2d 602, 605 (5 Cir. 1971).

entrapment. There is simply no evidence in the record of the instant case, introduced by either the Government or appellants, to support the theory that Brennan and Berman were entrapped in the conspiracy. The narrow *Sears* exception is inapplicable, the general rule controls, and we affirm the district court's refusal to allow appellants to plead in the alternative.

## IV. *The Canadian Search and Seizure.*

In late November, 1972, the New York office of the FBI notified the Frauds Section of the Royal Canadian Mounted Police in Toronto that Louis Marder, an American citizen living in Toronto, had information about stolen securities that would soon be brought into Canada for sale and distribution.[27] Marder, on his own initiative, had previously called the New York office of the FBI and stated that he desired to provide this information to the appropriate law enforcement agency. The FBI referred Marder to the Toronto Frauds Section. Other than the single telephone call to the Frauds Section alerting them to Marder's possession of information, American law enforcement officials played no further part in the subsequent Canadian search and seizure. After one unsuccessful attempt by the Frauds Section to contact Marder, he telephoned the Frauds Section and advised Sergeant Paradis that appellants Martin and Edwards and defendant Meierdiericks would be arriving shortly in Canada to sell counterfeit securities. Acting on the information provided by Marder, the Frauds Section placed a Toronto hotel, where the illicit transaction was to take place, under surveillance. After a short period of surveillance, during which time Martin, Edwards, and Meierdiericks were observed, the Frauds Section conducted a warrantless raid on adjacent rooms in the hotel on November 30, and arrested Martin, Edwards, Palmer, Meierdiericks, and Harte. The raid and accompanying search uncovered a large quantity of counterfeited securities and related items of evidence. Almost all the items seized by the Frauds Section were turned over to the FBI and subsequently introduced by the Government in the trial below. Appellant Edwards challenges the district court's refusal to grant his motion to suppress this evidence.

As a starting point, the fourth amendment exclusionary rule does not apply to arrests and searches made by foreign authorities on their home territory and in the enforcement of foreign law, even if the persons arrested and from whom the evidence is seized are American citizens. *Birdsell v. United States,* 346 F.2d 775, 782 (5 Cir. 1965); *cf. Kilday v. United States,* 481 F.2d 655 (5 Cir. 1973). The reasoning usually tendered in support of this limitation is the doubtful deterrent effect on foreign police practices that will follow from a punitive exclusion of the evidence in question by an American court. *See, e. g., Brulay v. United States,* 383 F.2d 345, 348 (9 Cir. 1967). But as the court below correctly recognized, two exceptions to the general rule obtain. First, if the circumstances of the foreign search and seizure are so extreme that they "shock the judicial conscience," a federal appellate court in the exercise of its supervisory powers can require exclusion of the evidence so seized. *Birdsell v. United States, supra* at 782 n.10; *cf. Mapp v. Ohio,* 367 U.S. 643, 659, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961); *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Second, if American law enforcement officials participated in the foreign search, or if the foreign authorities actually conducting the search were acting as agents for their American counterparts, the exclusionary rule can be invoked. *Birdsell v. United States, supra* at 782; *Stonehill v. United States,* 405 F.2d 738, 743 (9 Cir. 1968); *Brulay v. United States, supra* at 348; *cf. Reid v. Covert,* 354 U.S. 1, 5–8, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Best v. United States,* 184 F.2d 131, 138 (1 Cir. 1950), *cert. denied,* 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677 (1951).

---

27. The information given originally by Marder to the FBI indicated that the securities were stolen rather than counterfeit. Marder provided his information before the conspirators had decided to use the counterfeited TWA bonds and Walt Disney stocks.

Appellant Edwards concedes that the facts surrounding the search of the Toronto hotel room by Canadian officers are not so extreme that the judicial conscience is shaken by admission of the evidence in question, and we consequently have no need to elaborate on the first exception to the general rule. The remaining issue, however, and that to which we now turn, is whether the extent of participation by American officials in the Canadian search necessitates use of the exclusionary rule.

The few courts that have considered the question of how much American participation in a foreign search and seizure is required to mandate application of the exclusionary rule have not been unanimous in their choice of the precise test to be applied—though they have as a statistical matter been virtually unanimous in rejecting claims of undue participation. For example, in *Birdsell v. United States, supra,* we held that the fourth amendment was "inapplicable to an action by a foreign sovereign in its own territory in enforcing its own laws, even though American officials were present and *cooperated in some degree.*" 346 F.2d at 782 (emphasis added).[28] In a more elaborate opinion by the Ninth Circuit in *Stonehill v. United States, supra,* the test of undue participation was stated in the following terms:

> Thus, the Fourth Amendment could apply to raids by foreign officials only if Federal agents so substantially participated in the raids *so as to convert them into joint ventures between the United States and the foreign officials.*

405 F.2d at 743 (emphasis added).[29] And in still another attempt to clarify the problem of foreign searches, the United States Court of Military Appeals recently held that it is incumbent upon the Government to demonstrate that a challenged search is legal under the law of the country where it takes place. *See United States v. Jordan,* ___ USCMA ___, 19 Cr.L.Rptr. 2025 (April 14, 1976).[30]

Though we explicitly reject the test applied by the Court of Military Appeals in *Jordan,* we have no occasion to choose between the joint venture test of *Stonehill* or the apparently more relaxed test of *Birdsell.* Under either test, the minimal participation of American law enforcement officials in the Toronto search and seizure is insufficient to invoke for the benefit of appellant Edwards the protections of the fourth amendment. Looking to the facts, as we must, we perceive no possible way in which the goal of deterring unlawful conduct by American law enforcement officials can be served by excluding the evidence in question for the simple reason that there was no unlawful or unreasonable conduct on the part of the FBI in the handling of the Marder telephone inquiry. Normal lines of communication between the law enforcement agencies of different countries are beneficial without question and are to be encouraged. Criminal conspiracies, as this case amply demonstrates, are sometimes international in scope, and the routine transmittal of the name and telephone number of a possibly valuable informant across national borders clearly is permissible under the fourth amendment.

---

**28.** The participation in *Birdsell* was apparently limited to the use by Mexican officials of a Texas deputy sheriff, across the border on another matter, as an interpreter in the questioning that led to defendants' arrest and the subsequent search and seizure of stolen automobiles. On these facts, we upheld the trial court's refusal to grant a motion to suppress. Further language in *Birdsell* suggests that the result would be the same even where American authorities gave information leading to the arrest and search by foreign officials. 346 F.2d at 782. Under the facts of the instant case, we do not consider it necessary to comment on the suggestion in *Birdsell.*

**29.** The Ninth Circuit in *Stonehill* borrowed heavily from pre-*Mapp* cases using the "silver platter" doctrine. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Byars v. United States,* 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927).

**30.** This represents a retreat from the position taken after the first hearing of this case. *See United States v. Jordan,* 23 U.S.C.M.A. 525 (1975).

We hold that the district court properly refused to exclude the evidence seized by the Canadian authorities in this case.

## V. Introduction of the Previous Convictions of Appellants McConnell and Dondich Based on Nolo Contendere Pleas.

The district court, over repeated objections, permitted the Government to introduce into evidence Judgments of Conviction for appellants McConnell and Dondich based on an indictment charging conspiracy to defraud and mail fraud handed down by a federal grand jury in the Northern District of Ohio. See 18 U.S.C. §§ 371, 1341. The prior convictions, which arose from illegal transactions unrelated to those charged in the instant case, were based upon pleas of nolo contendere entered by appellants McConnell and Dondich. At the trial below, the Government sought to introduce the prior convictions as proof of a prior similar act relevant on the issue of intent. To support introduction the Government made a proffer of evidence showing the conduct of appellants underlying the prior

convictions; appellants at that time indicated that they were ready to demonstrate that the conduct underlying the convictions was not sufficiently similar to that charged in the instant indictment and that the prior convictions were too remote in time to permit introduction. The district court rejected all proffers of evidence bearing on the conduct underlying the convictions and ruled that the admissibility of a prior conviction would be determined solely from the face of the Judgment of Conviction. The district court further ruled that no showing to the jury of conduct underlying any prior conviction admitted into evidence would be permitted.[31] See First Supp. Record on Appeal, Vol. 33, at 149–67. With these restrictions and with appropriate limiting instructions,[32] the district court admitted into evidence the Judgments of Conviction entered by the Ohio federal district court. See Government's Exhibits, Nos. 151 & 152.

Both below and on appeal appellants McConnell and Dondich have strenuously objected to the jury's consideration of prior convictions based on pleas of nolo contendere.[33] The district court reasoned, how-

---

**31.** On appeal the Government contends that the district court failed to distinguish between the introduction of a prior conviction to impeach a witness and introduction of a prior conviction to prove some element of the crime charged. In the latter case, evidence of underlying facts is usually admissible, while in the former case underlying facts may be neither proved nor disputed. See United States v. Bryant, 490 F.2d 1372 (5 Cir. 1974); United States v. Gooding, 473 F.2d 425 (5 Cir. 1973). Notwithstanding the Government's apparently correct observation, we reject the argument that the net result of the district court's ruling was a lack of prejudice to appellants McConnell and Dondich.

**32.** The district court instructed the jury in the following terms:
You are specifically instructed, first, that these exhibits are to be considered by you for such weight as you may think they are entitled, in keeping with the further instruction I shall give you momentarily, but only with regard to the individual Defendants named in these exhibits. . . . Furthermore, even with respect to the particular Defendants who are named in these Exhibits individually, you are specifically cautioned and instructed that the fact that a Defendant may have committed an offense at some time is not evidence or proof whatever

that [at] a later time the accused committed the offense charged in the Indictment, even though both offenses may be of like nature. . . . Evidence as to an alleged earlier offense of a like nature may not therefore be considered by the Jury in determining whether the accused did the acts charged in the Indictment, nor may such evidence be considered for any purpose whatever, unless the Jury first find[s] that other evidence in the case standing alone establishes beyond a reasonable doubt that the accused did the acts charged in the Indictment. If the jury should find beyond a reasonable doubt from the other evidence in the case that the accused did the acts charged in the Indictment, then the jury may consider evidence as to an alleged earlier offense of a like nature in determining the state of mind or intent with which the accused did the act charged in the Indictment.
First Supp. Record on Appeal, Vol. 37, at 38–39.

**33.** Appellants also argue that the district court erred in ruling that the prior convictions were not too remote in time or too different in underlying conduct to compel their exclusion. In view of our handling of the nolo contendere issue, it is not necessary to consider the other arguments appellants make to the admission of the prior convictions.

ever, that introduction of the two Judgments of Conviction would not be tantamount to introduction of the contemporaneous pleas of nolo contendere. *See* First Supp. Record on Appeal, Vol. 33, at 166. The Judgments of Conviction provided to the jury disclose none of the facts or circumstances underlying the charges against appellants McConnell and Dondich in the Northern District of Ohio. On the contrary, other than setting out the terms of appellants' probation, the Judgments of Conviction both simply state that "it is adjudged that the defendant upon his plea of nolo contendere, and a finding of guilty by the Court, has been convicted of conspiracy to defraud and postal fraud." *See* Government's Exhibits, Nos. 151 & 152. For the reasons that follow, we are constrained to agree with appellants.

▮ Rule 11(b), Fed.R.Crim.P., expressly permits a defendant, with the consent of the district court, to enter a plea of nolo contendere. The plea is literally a statement by the defendant that he is unwilling to contest the charges in the indictment and operates as an admission of "every essential element of the offense [that is] well pleaded in the charge." *Lott v. United States,* 367 U.S. 421, 81 S.Ct. 1563, 6 L.Ed.2d 940 (1961). While the rule in other circuits, *see, e. g., Pfotzer v. Aqua Systems, Inc.,* 162 F.2d 779 (2 Cir. 1947) (Hand, L., J.), and in other contexts, *see, e. g., Maryland State Bar Association v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974) (disbarment proceeding), may be different, the rule in the Fifth Circuit generally forbids the use of a plea of nolo contendere for the purposes of impeachment or to show knowledge or intent in a proceeding different from that where the plea was offered.[34]

In *Mickler v. Fahs,* 243 F.2d 515 (5 Cir. 1957), plaintiffs, husband and wife, commenced a tax refund suit to recover deficiencies, fraud penalties, and interest paid under an assessment for the years 1938 through 1947. Plaintiff Mickler, the husband, took the stand as a witness in his own behalf and, on cross-examination by Government counsel, was asked:

> Mr. Mickler, I am going to ask you if you are the same C. M. Mickler who was indicted on September 28, 1949, for income tax evasion for the years 1943, 1944 and 1945, and who entered a plea of nolo contendere to that charge and was convicted and sentenced to pay a fine of $5,000.00 for each of those years?

243 F.2d at 516. Plaintiffs' attorney objected to the question, which objection was sustained. The district court refused to grant a mistrial, but did carefully instruct the jury to disregard the question asked by Government counsel for all purposes. On appeal, this court held that the questioning of plaintiff about his prior plea of nolo contendere was prejudical error left uncorrected by the admonishment to disregard and required reversal of the lower court's judgment.

> The Government does not make any contention that the question was proper. We have no doubt but that it was improper. A plea of nolo contendere is a mere statement of unwillingness to contest and no more. It is not receivable in another proceeding as evidence of guilt. . . . The same reasons which make the evidence of a plea of nolo contendere inadmissible as an admission will exclude it in a jury trial when offered for the purposes of impeachment. If the proof of the commission of a crime may be admitted such proof is not met by the offer of proof of a nolo plea. Such plea

---

**34.** In *Kilgore v. United States,* 467 F.2d 22, 27–29 (5 Cir. 1972), a tax refund suit in the wake of plaintiff's conviction for criminal tax fraud based on a nolo contendere plea, it was held that plaintiff's reputation witness could be asked on cross-examination whether he had heard that plaintiff had pleaded nolo contendere to the criminal charges. The court emphasized that the result would be different in the situation where the question was propounded to the criminal defendant himself. 467 F.2d at 27–28, *discussing Mickler v. Fahs,* 243 F.2d 515 (5 Cir. 1957).

is, as we have seen, an admission of guilt only in the case where it is made.

243 F.2d at 517.

*Piassick v. United States*, 253 F.2d 658 (5 Cir. 1958), decided approximately one year after *Mickler v. Fahs*, apparently expanded the prohibition on the subsequent use of a nolo contendere plea to the situation where the Government, in a later criminal prosecution, uses a prior *conviction* based on a nolo contendere plea. Appellant in *Piassick* was a wholesale grocer convicted of making a false statement in a required report to the Government on sales of raw materials suitable for distillation. Appellant took the stand in his own behalf and, on cross-examination, was asked: "In 1952, did you plead—enter a plea to failure to submit sugar reports in this same court?" At this point, appellant's attorney moved for a mistrial, but the trial judge overruled the motion. Counsel for the Government then asked: "You are the same M. L. Piassick who was convicted in—on or about April 4, 1952, on three counts of failure to submit and render sugar returns or sugar reports, aren't you, Mr. Piassick?" Appellant responded in the affirmative. The district court charged the jury, as the district court did in the instant case, that the evidence of the prior conviction was to be considered only on the question of intent. The prior conviction to which Government counsel in *Piassick* referred was based on a plea of nolo contendere, which fact, it is important to note, is not disclosed by the language of either of the Government's two questions.[35]

On appeal we held that the admission of this evidence necessitated a reversal of appellant's conviction. The section of the *Piassick* opinion discussing *Mickler v. Fahs* warrants repetition:

> In the *Mickler* case, as the Government points out, the offer in evidence of the nolo plea was made in a civil case arising out of the same set of facts as those involved in the case where evidence of

the plea was offered. In such situation, the Government concedes, the plea of nolo contendere cannot be used. We do not see how this difference between *Mickler* and this case calls for a different rule. Nolo contendere means, "I do not contest it." *It is, to be sure, a tacit confession of guilt, but solely for the purpose of the case in which it is entered. If it cannot be used in another case based on the same facts it would seem to follow, a fortiori, that it could not be used for collateral purposes in a case founded upon unrelated fact. . . . The admission of this evidence requires a reversal.*

253 F.2d at 661 (emphasis added).

In the portion of *Piassick* quoted above, the court speaks as if the plea of nolo contendere itself, rather than a conviction based upon the plea, was introduced before the jury that passed judgment on Piassick. The facts as recited by the court, however, do not bear this out. In the instant case, the Government argues that we are bound by a recognized distinction in this circuit between the plea of nolo contendere and the conviction based upon the plea. Under the Government's argument, it is only where undue emphasis is placed on the plea of nolo contendere in the presence of the jury that a reversal on appeal is required. The Government's argument suffers from two distinct problems. First, the cases decided in this circuit after *Piassick* fail to confirm or deny authoritatively the existence of a significant distinction between the plea of nolo contendere and the conviction based thereon. For example, in *Smith v. United States*, 287 F.2d 299 (5 Cir. 1961), heavily relied on by the Government in its brief, defendant in a suit by the United States under the False Claims Act to recover overcharges and penalties argued on appeal that he was improperly impeached with a conviction based on a nolo conten-

---

**35.** In the instant appeal, the Government argues that *Piassick* should be read as a case in which the fact of the plea of nolo contendere, as distinguished from the conviction based upon the plea, was unduly emphasized in the presence of the jury. As indicated above, however, the language of the questions asked by the Government in *Piassick* does not disclose the precise plea entered in the prior prosecution for submitting false sugar reports.

dere plea and growing out of the same facts. In rejecting this argument, the court offered the following:

> Next, while a plea of *nolo contendere*, as such, may not be received or used as an admission of civil or criminal liability, . . ., no objection was made to the evidence, so the conviction based on it was a relevant circumstance on the credibility of [defendant] as a witness.

287 F.2d at 302 (citations omitted).

Insofar as defendant in *Smith* failed to object to the evidence of the plea, the court's language suggesting a distinction between the plea and the conviction is not authoritative. Moreover, the proper interpretation of the above quoted language from *Smith*, contrary to the Government's reading of the same language, is that if defendant had properly objected to the evidence of the nolo contendere plea, the conviction itself would have been inadmissible for impeachment purposes. The defendant in *Smith* having allowed the evidence of the plea to come in without objection, the additional harm flowing from introduction of the conviction itself was certainly *de minimus*. *Smith* does not, consequently, resolve the issue of a possible distinction between the plea and the conviction.

The Government points also to our decision in *United States v. Driscoll*, 454 F.2d 792 (5 Cir. 1972), where defendant argued that it would have been improper for the Government to impeach him on the basis of his prior state conviction for a misdemeanor that had been expunged upon successful completion of probation.[36] In rejecting defendant's argument, we made the following comparison:

> However, the rationale of [*Mickler*] is quite different from that which Driscoll argues here. The decision in *Mickler* was

based on the court's conclusion that " . . . a plea of nolo contendere is a mere statement of unwillingness to contest and no more." 243 F.2d at 517. Obviously, an actual conviction is quite a different matter, whether or not that conviction is ultimately expunged by the state.

454 F.2d at 799.

The Government contends that this language substantiates its argument that there is a recognized distinction between the plea of nolo contendere and the conviction based thereon. The flaw in the Government's argument is that Driscoll's state court conviction was not founded upon a plea of nolo contendere; it was, thus, an "actual conviction" available for the purposes of impeachment. The implication of this observation is, of course, that a conviction based upon a plea of nolo contendere is not available for the purposes of impeachment.[37]

■ We have no occasion at this time, however, to rule directly on the merit of the Government's argued distinction between the nolo contendere plea and the resulting conviction; rather, the above discussion of the case law is limited in purpose to a refutation of the Government's position that the argued-for distinction is "well-settled" in this circuit's jurisprudence. As indicated above, the Government's argument suffers two defects, and it is by reason of the second defect that we are constrained to reverse the convictions of appellants McConnell and Dondich: the Judgments of Conviction provided to the jury in the instant case disclosed on their faces that both appellants had pleaded nolo contendere to the conspiracy to defraud and postal fraud charges brought in the Northern District of Ohio. This fact is not buried in a welter of

---

**36.** Defendant in *Driscoll* never took the stand and was never actually impeached with his prior conviction; he argued on appeal that the Government's threatened use of his prior conviction for impeachment purposes improperly prevented him from taking the stand in his own defense.

**37.** We do not consider *Kilpatrick v. Commissioner*, 227 F.2d 240 (5 Cir. 1955), relied on by

the Government in its brief, to be in point. In *Kilpatrick* we allowed prior convictions based on nolo contendere pleas to be used for the purposes of impeachment only because the special rules of evidence applicable to the Tax Court required this result. *Kilpatrick* is thus not inconsistent with later decisions in this circuit.

other information stated in the Judgment of Conviction; the form, on the contrary, is simple in design and the nolo contendere plea is revealed in a clause typed onto the largely printed form. It is beyond peradventure that a mere cursory reading of the Judgments of Conviction by the members of the jury would have revealed the pleas of nolo contendere entered by McConnell and Dondich. The instant case, thus, is not one where we must consider the propriety of the Government using only a *conviction* that is based on a nolo contendere plea. In our view, the facts of the instant case fall squarely within the *Mickler v. Fash-Piassick* clear prohibition on the use of a *plea* of nolo contendere to show knowledge and intent in a subsequent criminal prosecution.

The evidence against appellants McConnell and Dondich, albeit sufficient under the standard of *Glasser v. United States, supra,* nevertheless was not overwhelming, and the improper introduction of the nolo contendere pleas by the Government undoubtedly had a substantial effect on the deliberations of the jury. We are unable to say that the admission of the prior pleas of nolo contendere to similar charges in the recent past was harmless error.[38] *See United States v. Harbolt,* 491 F.2d 78, 80 (5 Cir. 1974). Accordingly, the convictions of appellants McConnell and Dondich are reversed.

### VI. *Appellant Palmer's Attempt to Withdraw His Guilty Plea.*

Appellant Charles Jess Palmer was charged under Counts One, Nine, and Ten of the indictment and, at the time of his arraignment on April 26, 1973, pleaded not guilty to all counts. On April 1, 1974, almost one month into the trial and shortly before the Government rested its case, appellant informed the district court that he desired to change his plea to guilty. At that time, the district court conducted a meticulously complete Fed.R.Crim.P. 11 hearing on appellant's change of plea. The district court inquired about the existence of a plea bargain; there was no plea bargain, though the Government did inform appellant that it would bring any subsequent cooperation on his part to the attention of the court. *See* Appendix at 34. Appellant's decision to change his plea was against the advice of counsel. *Id.* The district court then assured itself that appellant had been neither threatened nor coerced into changing his plea and carefully informed appellant of the consequences of his plea and the attendant waiver of his right to a jury trial and an opportunity to cross-examine the witnesses against him. *See id.* at 34–35. Relying largely on the testimony of Government witness Maurice Harte given in the previous four weeks, the district court satisfied itself that there was a sufficient factual basis for the plea. *See id.* at 36. Moreover, the district court went over all pertinent allegations in the indictment with appellant, eliciting from appellant at every juncture the admission that he had done the acts charged. *See id.* at 36–41. The district court specifically found that appellant's plea of guilty was knowing, voluntary, and factually supported, and further found appellant guilty on all counts. *See id.* at 41–42.

On June 5, 1974, appellant appeared before the district court for sentencing and requested that he be allowed to withdraw his earlier guilty plea. Appellant informed the district court that approximately one week after the trial had started, a Florida circuit court set aside the appeal bond that

---

**38.** In view of the timely and repeated objections to the introduction of the Judgments of Conviction, we emphatically reject the Government's argument that, by failing to move specifically for deletion of the references to the nolo contendere pleas in the Judgments of Conviction, appellants McConnell and Dondich waived their challenge to the admission of these documents. The Judgments of Conviction, as proffered by the Government, should have been excluded by the district court; it is incumbent upon the Government to present its documentary evidence in a properly admissible form. Appellants, given their timely objections to two items of documentary evidence, were certainly under no burden to assist the Government in making that evidence properly admissible. Appellants' objections were sufficiently specific.

he had obtained following his conviction on state misdemeanor charges. Appellant was immediately incarcerated. *See id.* at 47. During this period, appellant's wife was expecting a baby. *See id.* Appellant stated to the district court that he had been unable to communicate with his wife after the revocation of his state appeal bond, that his wife gave birth to a child while he was confined, and that he was not able to communicate with his wife until after he entered his plea of guilty in the instant case. *See id.* at 48. Appellant also informed the district court that, prior to his plea of guilty, he had been involved in fights and the like while confined in the state jail. *See id.* The district court ruled that, even assuming the truth of appellant's allegations, he could not withdraw his earlier guilty plea. Relying on the facts as developed in the earlier hearing and its observation of appellant's demeanor when he testified for the Government subsequent to the entry of his guilty plea, the district court specifically reiterated its earlier finding that the plea had been knowing and voluntary. *See id.* at 56–57. In this court, appellant challenges the district court's refusal to grant his motion.

■■ Where, as here, a Fed.R.Crim.P. 32(d)[39] motion to withdraw a plea of guilty is made prior to the time of sentencing, the district court possesses broad discretion to grant or deny the motion. *See, e. g., United States v. Simmons,* 497 F.2d 177 (5 Cir. 1974), *cert. denied,* 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 643 (1975); *United States v. McCoy,* 477 F.2d 550 (5 Cir. 1973). As with all appellate review of actions committed to the sound discretion of the trial court, our review focuses perforce on the facts disclosed in the record. We consider three of those facts as sufficient to sustain the district court's exercise of discretion, and we affirm the denial of the motion to withdraw the plea.

■ First, appellant Palmer was closely assisted by counsel at the time he changed his plea to guilty in April, 1974. *See De Leon v. United States,* 355 F.2d 286 (5 Cir. 1966). Indeed, the transcript of the hearing before the district court discloses that the abandonment of the not guilty plea was against the advice of counsel. We do not, of course, review the wisdom of a defendant's guilty plea; the opposition of counsel does suggest, however, that appellant Palmer was fully apprised of the pros and cons of his decision. Second, we are convinced that the district court was not clearly erroneous in its determination that appellant's plea of guilty was knowing and voluntary. *See, e. g., Rosas v. United States,* 505 F.2d 115 (5 Cir. 1974). The concern of appellant for his wife and child is understandable; similarly, the difficulties he experienced while under confinement bear on the question of voluntariness. Looking to the totality of the circumstances as revealed by the record, however, we remain unconvinced by appellant's attack on the voluntariness of his plea. *See United States v. Barrett,* 514 F.2d 1241 (5 Cir. 1975). It does not automatically follow that because appellant considered factors extrinsic to the question of his guilt, such as the unknown condition of his wife and child, that the decision to change his plea was involuntary; a rational and knowing choice would take all factors into consideration. In light of the careful and complete Fed.R.Crim.P. 11 hearing conducted by the district court, the answers elicited from appellant, and the subsequent observation of appellant as a witness, the district court was certainly correct in its view that appellant's change of plea was voluntary. Third, and of considerable importance, the interest in judicial economy militates against allowing appellant to withdraw his plea. The trial below consumed six weeks; the Government's case alone lasted almost four weeks. To allow appellant to withdraw his plea and force

---

**39.** Fed.R.Crim.P. 32(d) provides that

[a] motion to withdraw a plea of guilty or *nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea.

the Government to a retrial is a course we decline to follow.

By the above analysis, we do not mean to suggest that the three facts that we have focused on must be present for a district court's exercise of discretion to survive on appeal. We hold today only that where a defendant is assisted by counsel and enters a voluntary and knowing plea of guilt, and where notions of judicial economy and fairness work in favor of the Government, the district court does not abuse its discretion in refusing to allow defendant to withdraw his plea of guilty prior to the time of sentencing.

VII. *Miscellaneous Arguments.*

██ Appellant John Brennan argues on appeal that the district court erred in refusing to grant his motion for mistrial. Immediately after the jury had been selected and sworn in the court below, appellant's counsel moved for a mistrial on the grounds that at noon recess on the previous day appellant had been observed in shackles and under restraint. Appellant Brennan was at that time under confinement following his conviction on unrelated criminal charges. Appellant's counsel did not himself witness the alleged event and was unable to provide the district court with any information to indicate that the persons, if any, observing appellant were prospective jurors. The district court declined, we believed wisely, to make immediate inquiry of the jury members on this matter, but did rule that appellant's counsel could, if he chose to, conduct an evidentiary hearing after trial to determine whether any members of the jury had observed appellant under restraint. *See* First Supp. Record on Appeal, Vol. II, at 52–55. After the jury returned its verdict against appellant Brennan and the others, counsel for appellant did not request the evidentiary hearing that the district court indicated would be available. Under these circumstances, we deem appellant to have waived his argument that the district court erred in refusing the mistrial.

██ Appellant Brennan also challenges the introduction by the Government of his federal conviction in June, 1973, for conspiracy and possession of goods stolen from interstate commerce. *See* Government's Exhibit No. 154; 18 U.S.C. §§ 371, 659. As with the convictions of appellants McConnell and Dondich discussed above, the district court did not allow the Government to introduce evidence of the conduct underlying appellant Brennan's prior conviction. Nevertheless, the Government sought and the district court allowed introduction of the conviction to show intent and knowledge on the part of appellant. The Government's proffered evidence of the conduct underlying the conviction, which the jury never saw, would have shown that the property possessed by appellant and stolen from interstate commerce consisted of the same Oklahoma City Housing Authority bonds discussed in the testimony of Anthony Brennan and Maurice Harte. Applying the four-step test enunciated in *United States v. San Martin,* 505 F.2d 918, 921–22 (5 Cir. 1974), we hold that the district court properly allowed the Government to introduce appellant Brennan's prior conviction: (1) the Judgment of Conviction introduced by the Government demonstrated clearly and convincingly the existence of the prior similar offenses, (2) the 1973 conviction was not too remote in time from the instant prosecution, (3) appellant Brennan's intent was a material issue in the trial below, and (4) there was a substantial need for evidence bearing on the issue of intent.

██ Appellant Edwards complains that the district court committed error in overruling his objection to certain questions asked by the Government on cross-examination dealing with appellant's knowledge of or participation in any transactions with the Anglo-Canadian Group Ltd., the Normandy Trust, or an individual named Strauss. Appellant argued to the district court that he had been granted immunity from prosecution by the Justice Department covering his dealings with the above organizations and individual, and that the Government's line of cross-examination was therefore improper. Appellant also requested that the district court conduct an evidentiary hearing

on the alleged grant of immunity, which request the district court denied. The district court ruled correctly that the Government's cross-examination was proper in that it was directed to subject matter raised by Edwards when he testified in his own behalf. We accordingly reject appellant's argument that the district court should have sustained his objections to the Government's cross-examination and should have conducted an evidentiary hearing on the alleged grant of immunity. *See, e. g., United States v. Vigo,* 413 F.2d 691 (5 Cir. 1969); *Monroe v. United States,* 320 F.2d 277 (5 Cir. 1963), cert. denied, 375 U.S. 991, 84 S.Ct. 630, 11 L.Ed.2d 478 (1964).

Appellant Edwards also contends that the district court mishandled the jury's request for that portion of the transcript containing his and Philip Wilson's testimony. The district court refused to grant the jury's request. The discretion of the trial judge in ruling on jury requests of this nature is broad, *see, e. g., Government of the Canal Zone v. Scott,* 502 F.2d 566 (5 Cir. 1974); *United States v. Braxton,* 417 F.2d 878 (5 Cir. 1969), and we perceive no abuse of discretion on the facts disclosed by the instant record. As the Government pertinently notes in its brief, the portion of the transcript in question exceeds 300 pages in length and would have taken the jury, by the district court's estimate, a day or more to read. The possibility of undue emphasis by the jury on a small part of the testimony given in the six week trial of this case amply justified the district court's denial of the jury request.

Appellants Martin and Ford challenge what they allege were improper comments by the Government in its argument to the jury. We have examined the comments in question and find appellants' arguments to be without merit. *See United States v. Wayman,* 510 F.2d 1020, 1028 (5 Cir. 1975).

For the reasons discussed above, the convictions of appellants Edwards, Martin, Ford, Brennan, Morrow, Berman, Johnson, and Palmer are AFFIRMED; the conviction of appellant Scales on Counts Two through Seven is AFFIRMED; the conviction of appellant Scales on Count One is REVERSED; and the convictions of appellants McConnell and Dondich, in accordance with Section V of this opinion, are REVERSED.